```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
CCM ROCHESTER, INC.,                                          :
                                                              :
                              Plaintiff,                      :
                                                              :              14-CV-3600 (VEC)
              -against-                                       :
                                                              :              OPINION & ORDER
FEDERATED INVESTORS, INC.                                     :
                                                              :
                              Defendant.                      :
------------------------------------------------------------- X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/25/2014

VALERIE CAPRONI, United States District Judge:

      CCM Rochester, Inc., a registered investment advisor formerly known as Clover Capital Management, Inc. ("CCM" or "Clover"), filed suit on May 20, 2014, seeking damages arising out of a 2008 Asset Purchase Agreement (the "APA") pursuant to which Federated Investors, Inc. ("Federated") acquired all of the assets of CCM. Compl. ¶ 2. Federated moves to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6) for failing to plead fraud with particularity and failing to state claims for breach of implied duties to use best efforts and of good faith and fair dealing. For the reasons discussed briefly below, the motion is GRANTED in part and DENIED in part.

## LEGAL STANDARD

      In evaluating a motion to dismiss, the Court must accept the well-pleaded allegations of the Complaint as true and draw all inferences in the non-moving party's favor. *LaFaro v. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009). Nonetheless, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausibility" is not certainty. *Iqbal* does not

require the complaint to allege "facts which can have no conceivable other explanation, no matter how improbable that explanation may be." *Cohen v. SAC Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013). But "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

There is, of course, a heightened pleading standard for fraud. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To plead the circumstances constituting fraud with particularity, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). To plead malice, intent, or knowledge "generally" means that "the general 'short and plain statement of the claim' mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b).' " *Iqbal*, 556 U.S. at 687 (quoting 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p. 291 (3d ed. 2004)). But " 'generally' is not the equivalent of conclusorily . . . . [P]laintiffs must still plead the events which they claim give rise to an inference of [malice, intent, or] knowledge" to satisfy the Rule 8(a) pleading standard. *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) (citations omitted).

Federated argues that the Complaint fails to plead the circumstances of the alleged fraud with particularity and also argues that the Complaint fails adequately to plead fraudulent intent. Def. Mem. at 12-15. Additionally, Federated asserts that the facts alleged are insufficient to support a fraud claim sounding in tort because the fraud claim is duplicative of the breach of

2

contract claims.  Def. Mem. at 16.  As to the breach of contract claims, Federated asserts: that the limitations of liability clause contained in the APA precludes liability; that the claims impermissibly seek to vary the terms of the contract in violation of the APA's integration clause; and that the Complaint fails plausibly to allege that Federated acted in bad faith.  Def. Mem. at 17-25.

## FACTUAL BACKGROUND

In early 2008, "Clover sought a strategic partner with strong marketing capabilities" to invest in its products to "realize the full potential of [Clover's] investment management franchise."  Compl. ¶ 2.  Clover issued a "request for proposal" ("RFP") to potential strategic partners.  Compl. ¶¶ 21-22.  The RFP specified that Clover was "seeking a partner with an extensive distribution network and marketing capabilities that could be used to expand Clover's client base and increase Clover's assets under management."  Compl. ¶ 22.

On May 13, 2008, after Federated executives had visited Clover's offices to discuss the RFP, Federated made a detailed written proposal (the "Proposal") to acquire all of Clover's assets.  Compl. ¶¶ 3, 23-34; *see* Tambe Decl. Ex. 2.[1]  The Proposal responded to specific questions, including the strategic rationale for Federated's interest in acquiring Clover, potential synergies that would be realized from combining the two companies, and strategies for leveraging those synergies.  Tambe Decl. Ex. 2 at 2-4.  Of particular relevance here, Federated stated: that "CCM will significantly and immediately expand [Federated's] manufacturing capabilities in the value sector – **becoming our investment management "Center of Excellence" for value products**," *id.* at 2 (emphasis in original); [that "Federated distributing

---

[1]  The Complaint stated that the Proposal and the APA were attached as exhibits, Compl. ¶¶ 4, 25, but both documents were omitted, albeit inadvertently.  *See* Dkt. 2.  It is proper for the Court to consider the documents on a motion to dismiss because both documents were "incorporated by reference" in the Complaint.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

CCM products represents a tremendous strategic growth opportunity for both firms," *id.* at 3;] that Federated would "[e]stablish a growth platform for the combined business" and "[s]ell CCM products through [Federated's] distribution platform," *id.*; and that CCM would be integrated into Federated "as one of the Federated team – all operating for the same company, towards the same mutually established goals, . . . [and] receiving equal attention for resources and support," *id.* at 4.

On June 9, 2008, Clover executives met with Federated executives at Federated's offices in Pittsburgh, where Federated executives reiterated that Federated "intended to use its extensive sales and distribution capabilities to significantly and rapidly expand the assets under Clover's management" and "intended to brand and promote the Clover Investment Products as Federated's 'Center of Excellence' for value-oriented investment products."  Compl. ¶¶ 35-36.

CCM accepted Federated's acquisition offer and the parties – both highly sophisticated – executed the APA on September 12, 2008.  Compl. ¶ 4; *see* Tambe Decl. Ex. 3.[2]  The purchase was structured so that there was an upfront cash payment to CCM at closing of $30 million and contingent payments (the "Earnout Payments") over five years following the closing (the "Earnout Period").  Compl. ¶¶ 40-41.  The contingent payments, which were tied to the growth in revenues of the acquired business, ultimately amounted to approximately $18 million.  Compl. ¶ 115.  Federated suggests that, given the economic environment during the five-year period following the execution of the APA,[3] CCM's growth and the contingent payments made to CCM

---

[2]   The parties subsequently amended the APA on December 1, 2008. *See* Tambe Decl. Ex. 4.

[3]   The deal closed days before the collapse of Lehman Brothers Holdings, Inc. triggered the "Great Recession."  Def. Mem. at 5.

were substantial[4] and argues that any claim that Clover was defrauded or treated unfairly is implausible.  Def. Mem. at 2.

Clover, on the other hand, asserts that Federated fraudulently induced it to accept the acquisition offer and to accept much of the consideration in the form of future payments contingent upon CCM's post-acquisition growth.  Compl. ¶ 5.  CCM asserts that Federated misrepresented its intent to use its marketing and distribution platform to grow the assets under CCM's management.  Compl. ¶¶ 26-39, 118-121.  According to Clover, Federated actually intended "to undertake only minimal, *pro forma* efforts to market and distribute the Clover [funds] and, even then, to do so as late in the Earnout Period as possible in order to minimize its Earnout Payments to Clover."  Compl. ¶37.  Moreover, CCM alleges that in the third year of the Earnout Period, "Federated launched an intensive marketing and distribution campaign on behalf of its own . . . value-oriented fund, which . . . was competing in the same space for assets" with Clover.  Compl. ¶¶ 76-78.  CCM claims that, consistent with Federated's bottom-line incentives, this marketing campaign "affirmatively steered clients seeking large cap value products away from Clover's Large Cap Fund" and increased the assets under the competing fund's management by more than $15 billion dollars during the last three years of the Earnout Period.  Compl. ¶¶ 79, 86.  CCM asserts that Federated's acts and omissions breached an implied obligation to use best efforts to market CCM's funds because Federated had exclusive control over marketing and sales of CCM's investment products, Compl. ¶¶ 47-48, 125-126, and breached an implied duty of good faith and fair dealing because Federated made affirmative

---

[4]     Under the APA's formula for calculating contingent payments, the actual Earnout Payments reflected a compounded annual growth rate of 9% per year for the five-year period.  Compl. ¶ 115; Def. Mem. at 2.  The formula allowed Clover to be compensated for deficiencies in underperforming years with any surplus in years that outperformed the capped Earnout Payment.  Compl. ¶¶ 44-45.

efforts to minimize CCM's Earnout Payments, Compl. ¶¶ 88-89, 131-135.  Finally, CCM asserts a claim for indemnity under Section 10.2 of the APA.  Compl. ¶¶ 137-139.

## FRAUDULENT INDUCEMENT

The Complaint adequately alleges a claim for fraudulent inducement.  To state a claim for common law fraud under New York law, a plaintiff must allege facts showing: "(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury." *Premium Mortg. Corp. v. Equifax, Inc.,* 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).  Of course, "[i]n a federal diversity action, such a claim must be pleaded with particularity" pursuant to Rule 9(b).  *Id.*

The Complaint pleads with particularity misrepresentations of fact that can plausibly be read to show a motive for committing fraud (the desire to minimize the cost of acquiring CCM, Compl. ¶¶ 5, 39, 88-89) and an opportunity for doing so (*e.g.*, Federated's total control over CCM's sales and marketing enabled it to steer clients to Federated's existing funds and not to CCM's equivalent funds, Compl. ¶¶ 47, 90-112).  *Cf. Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994).[5]  CCM alleges that it relied on specific representations Federated made in the Proposal that indicated Federated would make immediate and significant efforts to distribute CCM's products.  *See, e.g.*, Compl. ¶¶ 30, 32-34; Proposal at 2-4.  In addition to those representations, CCM claims that Federated executives, who are named in the Complaint, made

---

[5]  The Court is not unsympathetic to Defendant's argument that Federated's and CCM's interests were aligned and, therefore, the motive alleged by CCM is illogical.  Def. Mem. at 13.  Nevertheless, CCM has successfully threaded the needle with a theory that acknowledges Federated's interest in the long term profitability of Clover while still asserting a motive to delay the growth of Clover during the Earnout Period.  Whether CCM can successfully prove facts necessary to support that artfully-pled theory remains to be seen.

misrepresentations on June 9, 2008, during an in-person meeting in Pittsburgh about the prospective acquisition. Compl. ¶ 35. CCM claims that Federated represented that, if CCM accepted its acquisition proposal, Federated would use its resources to "fuel the growth" of the assets under CCM's management and robustly to promote CCM's funds. Compl. ¶¶ 5, 34, 36. These statements were misrepresentations, according to CCM, because Federated did not intend to "fuel the growth" of CCM until after the Earnout Period substantially passed, thereby minimizing the amount of the contingent payments. Compl. ¶¶ 6, 37.[6] CCM claims that Federated created these false expectations in order to induce CCM to accept a greater portion of its consideration in the form of future payments contingent upon post-acquisition growth so that Federated could minimize its acquisition costs. Compl. ¶¶ 5, 37. CCM claims that because the actual Earnout Payment was approximately $37 million less than the maximum potential Earnout Payment, CCM was harmed by agreeing to allow the consideration to be paid, in part, through contingent payments. Compl. ¶¶ 39, 116. At this stage of the litigation, the Complaint adequately pleads the particulars of who, what, when and why of a claim for common law fraud. *See Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112 (1995); *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403 (1958).

Federated argues that the APA's integration clause and a disclaimer in Federated's proposal foreclose the reasonableness of any reliance on allegedly false statements. Def. Mem. at 15. The integration clause, contained in Section 12 of the APA, states: "This Agreement and the other Transaction Documents, together with any Exhibits and Schedules hereto or thereto,

---

[6] Other facts in the Complaint support CCM's assertion that it was lead to believe that Federated was committed to rapidly integrating CCM and growing its investment funds. For example, the Complaint claims that Federated's president told Clover's Chief Executive Officer and Chief Operating Officer ("COO") that the COO would assume a role on Federated's executive committee, which steered Federated's business operations. Compl. ¶¶ 94-97. A seat on the executive committee would have bolstered the ability of CCM to promote CCM's growth. Compl. ¶ 98. Although the Complaint does not allege that these statements were false when made, they contributed to CCM's expectations regarding Federated's actions post-acquisition.

contain the entire agreement and all understandings, and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the Transactions." Tambe Decl. Ex. 3.  New York law is clear, however, that a "'general and vague merger clause' is insufficient to warrant exclusion of parol evidence showing fraud." *Aetna Casualty and Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 575 (2d. Cir. 2005) (quoting *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320 (1959)).  By extension, "when a contract contains an 'omnibus statement' disclaiming that any representations outside the contract were made, it will not preclude a claim for fraud." *Id.*  "When, however, the contracting party disclaims 'the existence of or reliance on *specified* representations,' it will not be allowed to claim it entered into the contract in reliance thereon.'" *Id.* (quoting *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993)) (emphasis added).  *See also Cohen v. Cohen*, 993 F. Supp. 2d 414 (S.D.N.Y. 2014).  The APA's general merger clause disclaiming any representation whatsoever does not preclude CCM from pleading reasonable reliance on specific representations by Federated that allegedly induced it to accept Federated's acquisition proposal.

      The disclaimer in Federated's proposal is equally unavailing.  The disclaimer stated:

> Both parties acknowledge that no contract or agreement providing for a transaction will be deemed to exist unless and until a written definitive agreement relating to the transaction has been executed and delivered.  Either party may terminate discussions at any time prior to the execution of a Definitive Agreement without liability to the other party.

Tambe Decl. Ex. 2 at 2.  This disclaims that a contract was formed based on the proposal; it does not say that CCM could not or should not rely on the veracity of the representations in the proposal when deciding whether to accept the acquisition offer.[7]

---

[7] As a factual matter, if the representations in the proposal – particularly the representations relative to marketing – were as important to CCM's decision to accept Federated's offer as it now represents them to have been, one would expect sophisticated parties would have incorporated the most salient representations into the APA.

8

The Court also rejects Federated's final argument that the fraudulent inducement claim is duplicative of a claim for breach of contract and therefore fails to state a claim for relief. Federated cites *Telecom International America, Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001), for the settled rule of New York law that "simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder is insufficient to state an independent tort claim." But "parallel fraud and contract claims may be brought if the plaintiff . . . points to a fraudulent misrepresentation that is collateral or extraneous to the contract" by alleging the defendant made "a misrepresentation of a present fact [which] gives rise to a separate cause of action for fraudulent inducement." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007). CCM's fraudulent inducement claim satisfies the requirements to plead a tort claim that is independent of a breach of contract claim under New York law.

## BREACH OF CONTRACT

CCM claims that the APA's payment structure imposed on Federated an implied covenant to make reasonable, good faith efforts to market and distribute CCM's investment products and alleges that Federated's failure to make "best efforts" to market and distribute CCM's investment products breached the APA. Compl. ¶¶ 123-126. CCM also claims that Federated breached the APA's implied duty of good faith and fair dealing by taking steps intentionally calculated to reduce the Earnout Payments, thereby depriving CCM of the benefit of its bargain. Compl. ¶¶ 131-134.

---

At the pleadings stage, however, the Court accepts CCM's factual assertion that the representations were relied on and were important to CCM.

9

Federated argues that CCM's contract claims are barred because (1) Section 10.8 of the APA is a contractual limitations on liability clause that precludes claims for breaches other than breaches of representations, warranties, and covenants contained in the APA,[8] Def. Mem. at 17; (2) imposing implied covenants of "best efforts" and "good faith" would impermissibly vary the agreed-upon terms of the APA that were negotiated between sophisticated parties, Def. Mem. at 18-21; (3) the Section 12 integration clause bars CCM from claiming the parties had any prior agreement or understanding related to the APA, Def. Mem. at 20-21; and (4) the claims failed to allege that Federated acted in bad faith, Def. Mem. at 21-25.

The Court finds that the Complaint states a claim for breach of the duty of good faith and fair dealing, but does not state a claim for breach of an implied obligation to use best efforts to market the Clover Funds.

Defendant asserts that the limitation of liability clause of the APA bars CCM's breach of contract claims. Def. Mem. at 17-18. As Defendant acknowledges, however, Section 10.8 of the APA does not bar claims for intentional or willful breach. Def. Mem. at 17; APA Section 10.8 ("[E]xcept with respect to claims for fraud, intentional or willful breach . . . the rights provided to the Parties under this Section 10 shall be the sole and exclusive remedies . . . ."). CCM alleged that Federated's actions were intentional or willful breaches of implied covenants to

---

[8] Section 10.8 of the APA states:

**Remedies Exclusive.** From and after the Closing, except with respect to claims for fraud, intentional or willful breach or equitable relief, or as provided in *Section 6.6.3, Section 9(b), Section 9(c),* or *Section 10.6* above, including specific performance made with respect to breaches of any covenant in this Agreement or the other Transaction Documents (the ***"Excluded Claims"***), the rights provided to the Parties under this Section 10 shall be the sole and exclusive remedies of the Parties and their respective Affiliates with respect to claims under this Agreement, the other Transaction Documents or the Transactions contemplated hereby. Without limiting the generality of the foregoing, other than in connection the Excluded Claims or as required under Applicable Law by a Governmental Authority, in no event shall any Party, its successors, or permitted assigns be entitled after the Closing to claim or seek rescission of the transactions contemplated by this Agreement.

make best efforts and of good faith and fair dealing. *See, e.g.,* Compl. ¶ 88 ("Federated's failure to make a reasonable effort to market and distribute Clover Investment Products, and Federated's marketing campaign on behalf of a competing Federated fund, each materially reduced the Clover Investment Products' growth rate during the Earnout Period.  This was no accident."); Compl. ¶ 89 ("Federated's acts and omissions were willfully and intentionally undertaken in bad faith to . . . reduce Federated's Earnout Payments to Clover."); Compl. ¶ 133 ("Federated's other acts and omissions during the Earnout Period also adversely impacted the Clover Fund's ability to receive the Maximum Earnout Payment, thereby frustrating the purpose of the Agreement and depriving Clover of the benefit of its bargain.").  By its own terms, the limitation on liability clause contained in Section 10.8 of the APA does not preclude CCM's contract claims at the pleading stage.

CCM's claim that Federated breached an implied duty to use best efforts to market the Clover investment products, however, would require the Court to read substantive terms into the APA that could have been, but were not, included in the contract.  New York law is clear that when interpreting contracts, courts should apply "the 'familiar and eminently sensible proposition of law [] that, when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.' " *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)) (alterations in *Vermont Teddy Bear*).  *See also Law Debenture Trust Co. v. Maverick Tube Co.*, 595 F.3d 458, 467 (2d Cir. 2010).  "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001).  Notwithstanding conclusory allegations in the

Complaint to the contrary, the terms of the APA do not impose any obligation on Federated to develop a specific plan to market or distribute CCM's investment products.[9] That being the case, the Court cannot impose such an obligation on Federated under the rubric of an implied duty of best efforts.[10]

CCM's claim of breach of the general implied duty of good faith and fair dealing stands on different footing. "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011). "A breach of the duty of good faith and fair dealing is considered a breach of contract," *id.* (citation omitted), and "a party may be in breach of the duty even when it has abided by the express terms of the contract," *In Touch Concepts, Inc. v. Cellco Partnership*, 949 F. Supp. 2d 447, 466 (S.D.N.Y. 2013) (citations omitted). *See also Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 97 A.D.2d 781, 784 (2d Dep't 2012). The duties of good faith and fair dealing "do not imply obligations inconsistent with other terms of the contractual relationship . . . [but] do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (citations and internal quotations omitted). Moreover, the covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of

---

[9] *Cf.* Compl. ¶ 126 ("By failing to make a reasonable, good faith effort to market and distribute the Clover Investment Products, such as the one detailed in Federated's own Marketing Plan, Federated breached the Agreement." (sic)).

[10] CCM relies on *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 574 n.8 (2d Cir. 1969), for the proposition that "the Second Circuit has emphasized that a defendant may be 'obligated to use its best efforts to []market [plaintiff's] product even if the agreement did not expressly say so.'" Pl. Mem. at 21. What Plaintiff ignores is that the contract in *Perma* included an express obligation to manufacture and market the product. The Second Circuit simply indicated that the contract at issue was not illusory – not only was there a manufacturing and marketing obligation, but there was an implied duty to use best efforts in connection with those contractual obligations. That is entirely distinguishable from what CCM asserts here – an implied best efforts duty in connection with a marketing obligation that appears nowhere in the contract.

12

the other party to receive the fruits of the contract." *Fishoff*, 634 F.3d at 653 (quoting *511 W. 232nd Owners Corp.*, 98 N.Y.2d at 153). "For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 16 (2d Cir. 2014) (quoting *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514 (2d Dep't 1999)).

CCM makes specific allegations that Federated took steps intentionally calculated to minimize the Earnout Payments to CCM. For example, CCM claims that not only did Federated not make a meaningful effort to market and distribute *CCM's products* as late as the fourth year of the Earnout Period – despite having exclusive control over marketing and sales under the APA – but it launched an intensive – and successful – marketing and distribution campaign on behalf of a *competing* fund that displaced CCM's investment products in Federated's distribution channels and steered investors away from CCM's funds. Compl. ¶ 6-7, 47, 76-78, 86-87. These actions were in the face of CCM's explicit reasons for entering in to the APA (to form a strategic partnership that would expand CCM's client base and increase the assets under CCM's management, Compl. ¶ 22) and Federated's representations that convinced CCM to sell its assets to Federated (*e.g.*, that the acquisition represented a "tremendous strategic growth opportunity;" that Federated would "[e]stablish a growth platform for the combined business;" that CCM would be Federated's go-to fund for value products; and that CCM would "receiv[e] equal attention for resources and support" as all other divisions of Federated, Tambe Decl. Ex. 2 at 2-4). While the covenant of good faith and fair dealing "cannot be construed so broadly as effectively to . . . create independent contractual rights," *Consol. Edison, Inc. v. Northeast Utils.*,

13

426 F.3d 524, 529 (2d Cir. 2005) (quoting *Fesseha v. TD Waterhouse Investor Servs.*, 305 A.D.2d 268, 268 (1st Dep't 2003)), CCM's theory relative to its allegations that Federated took steps to minimize CCM's Earnout Payment does not do so.

For the same reasons that the Court finds that Complaint adequately alleges that Federated acted intentionally to minimize CCM's Earnout Payments, the Court also finds that Complaint contains sufficient facts to give rise to an inference that Federated took those actions in bad faith, to the extent bad faith is the proper measure of a breach of the covenant of good faith and fair dealing. *See Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1069 (2d Cir. 1993) (holding that the "minimum standard for bad faith" is "gross negligence or recklessness"); *but see Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817-18 (2d Cir. 2014) ("A plaintiff [alleging a breach of the covenant of good faith] must show substantially more than evidence that the defendant's actions were negligent or inept . . . . such as that the defendant 'act[ed] arbitrarily or irrationally in exercising [the] discretion' afforded to it under the contract." (citations omitted)).

## CONCLUSION

Given the state of the economy during the time period that is at issue, the fact that CCM received any payout based on growth of revenue is impressive. Moreover, the fact that marketing may not have occurred exactly as discussed during the courtship of CCM is some evidence, but it is not overwhelmingly strong circumstantial evidence, of Federated's intent at an earlier, more economically-upbeat time. CCM has adequately alleged that Federated never intended to follow through on its representations that if its acquisition offer was accepted Federated would support the growth and expansion of the Clover products and that Federated made those misrepresentations to induce CCM to agree to backload a portion of the

14

consideration through future payments tied to growth. In short, CCM's claim of fraud is at the edge of plausibility, but it is enough to cross "the line between possibility and plausibility of 'entitlement to relief.'" *Twombly*, 550 U.S. at 557.

Similarly, CCM has adequately alleged a breach of contract claim based on allegations that Federated's acts and omissions during the Earnout Period were intentionally undertaken to harm CCM's Earnout Payments in breach of an implied covenant of good faith and fair dealing. Whether CCM can adduce proof to demonstrate these claims remains to be seen.

Count Two of the Complaint is DISMISSED. In all other regards, Defendant's motion to dismiss is DENIED. The Clerk of Court is directed to terminate Docket Entry 8.

**SO ORDERED.**

Date:  **November 25, 2014**
       **New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**