**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CCM ROCHESTER, INC., f/k/a/ CLOVER CAPITAL MANAGEMENT, INC., <br><br> PLAINTIFF, <br><br> v. <br><br> FEDERATED INVESTORS, INC., <br><br> DEFENDANT. | Case No. 14-cv-3600 (VEC) <br><br> **ECF CASE** |

**MEMORANDUM OF LAW IN SUPPORT OF FEDERATED INVESTORS, INC.'S**
**MOTION TO EXCLUDE CERTAIN OPINIONS PROFFERED BY PLAINTIFF**

JONES DAY
Jayant W. Tambe
Tracy V. Schaffer
222 East 41st Street
New York, New York 10017
(212) 326-3939

JONES DAY
Jeffrey D. Baltruzak
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania 15219-2514
(412) 391-3939

*Attorneys for Defendant*
*Federated Investors, Inc.*

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

    I.        BACKGROUND ................................................................................ 3

          A.    Clover's Pre-Acquisition Performance ...................................... 3

          B.    The Asset Purchase Agreement ................................................ 4

          C.    Federated's Sales and Marketing Efforts ................................. 5

          D.    Market Conditions During the Contingent Payment Period ..................... 7

          E.    Post-2008 Investment Performance of the Clover Products ..................... 8

    II.       STEVEN POMERANTZ AND GLENN SHEETS ................................ 9

          A.    Steven Pomerantz's Opinions and Analysis ........................... 9

          B.    Mr. Sheets's Opinions Incorporating Dr. Pomerantz's Opinions ........... 12

ARGUMENT ................................................................................................... 13

    I.        LEGAL STANDARD ..................................................................... 13

    II.       THE OPINIONS OF DR. POMERANTZ SHOULD BE EXCLUDED ............ 16

          A.    The  "Causation" Opinion Is Speculative and Unsupported ................... 16

          B.    Dr. Pomerantz's Own Data Does Not Support His Causation Opinion ................................................................. 17

          C.    Dr. Pomerantz's "Peer Group" Composition Is Flawed ................... 20

          D.    Dr. Pomerantz's Methodology Is Unreliable ........................... 21

          E.    Dr. Pomerantz's Small Cap Opinion Should Not Be Admitted .............. 23

    III.      THE OPINION OF MR. SHEETS SHOULD BE EXCLUDED ................... 25

CONCLUSION ................................................................................................. 25

ATTACHMENTS

    Federated Clover Revenue Growth ................................................... Tab A

    Hypothetical Pomerantz Calculations ............................................... Tab B

    Pomerantz's Modified Clover Flow Calculation ................................ Tab C

    Applying Annual "Allocations" ........................................................ Tab D

    Fund-by-Fund "Allocation" .............................................................. Tab E

## TABLE OF AUTHORITIES

Page

CASES

*Amorgianos v. National R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)..........................................................................13, 14, 15

*Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*,
  910 F.Supp.2d 629 (S.D.N.Y. 2012)..........................................................................14

*Beastie Boys v. Monster Energy Co.*,
  983 F.Supp.2d 369 (S.D.N.Y. 2014)..................................................................17, 24

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ................................................................14, 15, 17, 4

*Bourjaily v. United States*,
  483 U.S. 171 (1987)......................................................................................13

*Celebrity Cruises Inc. v. Essef Corp.*,
  434 F.Supp.2d 169 (S.D.N.Y. 2006)..................................................15, 21, 22, 23

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)..................................................................................13, 14

*Faiveley Transp. USA, Inc. v. Wabtec Corp.*,
  511 F. App'x 54 (2d Cir. 2013) ......................................................................14

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  2015 U.S. Dist LEXIS 16034 (S.D.N.Y. Feb. 10, 2015).......................21, 22, 23, 25

*Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*,
  552 F. App'x 13 (2d Cir. 2014) ......................................................................13

*In re MTBE*,
  2008 U.S. Dist. LEXIS 44216 ......................................................................20, 25

*Israel v. Springs Indus.*,
  2006 U.S. Dist LEXIS 80863 (E.D.N.Y Nov. 3, 2006)............................................25

*Kozar v. Sharp Elecs. Corp.*,
  2005 U.S. Dist. LEXIS 49384 (W.D. Pa. Sept. 30, 2005)......................................25

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)................................................................................................13, 15

*Lippe v. Bairnco Corp.*,
  99 F. App'x 274 (2d Cir. 2004) ...........................................................................15, 16, 23

*MLB Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008)................................................................................14, 17, 25

*Nimely v. City of N.Y.*,
  414 F.3d 381 (2d Cir. 2005)...........................................................................................15

*Raskin v. Wyatt Co.*,
  125 F.3d 55 (2d Cir. 1997)..................................................................................... passim

*Roman v. Sprint Nextel Corp.*,
  No. 12-cv-276 (VEC), 2014 U.S. Dist. LEXIS 138951 (S.D.N.Y. Sept. 29,
  2014)
  ...........................................................................................................15, 19, 20, 23

**OTHER AUTHORITIES**

Federal Rule of Evidence 702..............................................................................1, 13, 14, 15, 25

Federal Rule of Evidence 401............................................................................................1, 14

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Pursuant to Federal Rules of Evidence 401 and 702, Federated Investors, Inc. ("Federated") hereby moves to exclude certain opinions of Steven Pomerantz ("Dr. Pomerantz") and Glenn Sheets ("Mr. Sheets") offered by Plaintiff CCM Rochester, f/k/a/ Clover Capital Management, Inc. ("Plaintiff" or "CCM").[1]

## INTRODUCTION

In late 2008, Federated paid $30 million to purchase substantially all of the assets of Clover, an investment advisor that managed equity investments using a traditional value management style.  Under the Asset Purchase Agreement ("APA"), Federated paid an additional $18 million in contingent payments when the acquired business's revenues grew over the next five years (the "Contingent Payments" and "Contingent Payment Period").  Although investors fled traditional equity investments after the financial crisis, and although Clover's investment performance stumbled, under Federated's watch customers invested more than $2 billion in Clover products, driving growth in revenue of 9% per year on average over the five-year period. As this Court recognized, "given the state of the economy during the time period at issue, the fact that [CCM] received *any* payout based on growth of revenue is impressive."[2]

In this lawsuit, CCM's principals Mike Jones and Steve Carl seek to collect an additional $37 million in Contingent Payments.  However, CCM's exclusive attempt to quantify that claim – the opinions of Dr. Pomerantz and Mr. Sheets – is doomed because those witnesses have admitted that their central opinions are unsupported and their core methodology is novel, untested, unreliable and contradicted by their own data and observations, all of which they blithely ignore.

---

[1] References to CCM are to the Plaintiff in this action.  References to Clover refer to the investment advisory business of Clover Capital Management, Inc. that was purchased by Federated in late 2008.

[2] Decision and Order [Dkt. No. 21], dated November 25, 2014 (the "Decision") at 14.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Under the APA, CCM could earn Contingent Payments only if Clover increased its revenues above an agreed-upon base amount.  Clover's revenues could increase if the Clover products attracted new assets (in excess of redemptions and withdrawals) or the investment performance of the funds resulted in a growth of assets under management.  No fact witness has provided any evidence that "but for" Federated's alleged conduct, **any** more Clover products would have been sold.  Mr. Jones conceded that he could only speculate about any such increased sales.  (Tambe Decl. ¶ 39, Tab K (Jones 30(b)(6) Tr. 139:21-140:3).)   In a misguided effort to fill this evidentiary hole, CCM proffers the opinion of Dr. Pomerantz that Clover would have attracted an additional $3.9 **billion** in net investments.  Mr. Sheets uses that figure to calculate an increase in revenues to arrive conveniently at the $37 million in additional Contingent Payments – the maximum amount permissible under the APA.

Dr. Pomerantz opines that "***Federated's sales efforts highly favored Strategic Value over Clover Value***, as evidenced by their respective asset growth."  (Tambe Decl. ¶ 21, Fed. Ex. 127 ("Pomerantz Report") at 6 (emphasis added).)[3]  He further opines that the Clover Large Cap Value products "would have received" $3.9 billion in additional assets ***"[h]ad Federated raised new money*** for the Competing Funds consistent with the industry average calculated above." (*Id.* at 11, 12 (emphasis added).)  However, Dr. Pomerantz's report contains no causal analysis, and he testified that he performed no such analysis.  Nor did he analyze Federated's efforts to market Clover products and has no opinion on the adequacy of those efforts.  Similarly, he did not study the marketing efforts for ***any*** of the funds he used to create his so-called "industry average."  Not only is there no basis for these opinions, the methodology used by Dr. Pomerantz is novel, untested, unreliable and riddled with basic math and statistical errors.  And, if that were

---

[3] "Strategic Value" refers to the Federated Strategic Value Dividend Fund (also called "Strategic Dividend"), one of Federated's over 100 investment strategies and mutual funds.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

not enough, the conclusions that Dr. Pomerantz would have a jury draw are actually **contradicted** by his own data (flawed and incomplete as it is).  In sum, the opinions concerning an additional $3.9 billion of net asset sales are speculative, unsupported, and would offer no help to a jury to resolve the claims at issue.

Dr. Pomerantz also offers the unsupported causal opinion that "Federated failed in its goal to sell the Clover Small Cap fund **as evidenced by the fact that**, at the close of the Earnout Period, it remained far below its capacity for assets."  (*Id*. at 6 (emphasis added).)  Dr. Pomerantz conceded, however, that he did not analyze Federated's sales of that fund.  All he did was generate a list of the ten largest small cap funds.  That is irrelevant.  There is no claim that Federated was obligated to make Clover's small cap fund the largest small cap fund in the land.  This opinion will not aid the jury in any respect and should be excluded.

CCM's other expert, Mr. Sheets, does little more than incorporate and rely upon Dr. Pomerantz's opinions to calculate the revenues that CCM would have earned had it raised an additional $3.9 billion.  Mr. Sheets has no independent basis for the causation opinions that underlie his calculation, and he admitted that he offers no opinion on causation.  Because Dr. Pomerantz's opinions are inadmissible, Mr. Sheets's opinion should be excluded as well.

## I.     BACKGROUND

### A.     Clover's Pre-Acquisition Performance

As of December 31, 2007, Clover managed approximately $2.5 billion in assets, and generated annual revenues of $16.8 million.  (Tambe Decl. ¶ 2, Fed. Ex. 1 at 1, 5.)  In contrast to the numerous and diverse investment strategies employed by Federated, Clover invested in equities and employed a "traditional value" investment strategy: *i.e.* Clover invested in the equity of public companies trading at attractive values relative to cash flow, book value, financial strength and historical valuations.  (Tambe Decl. ¶ 2, Fed Ex. 1 at 11; Compl. ¶18.)  Moreover,

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

unlike Federated, Clover did not distribute any mutual funds, but rather provided sub-advisory services on three mutual funds that were administered through a third-party, Touchstone Investments, Inc.  (Tambe Decl. ¶ 2, Fed. Ex. 1 at 8.)  Before the Acquisition, Clover's growth was stalled, it was experiencing significant asset outflows (redemptions), and its top-four earning employees, including its president Mr. Jones, took temporary salary reductions as part of a cost-cutting campaign.  (Tambe Decl. ¶¶ 2-3, Fed. Exs. 1, 2.)

> ### B.     The Asset Purchase Agreement

Federated purchased substantially all of Clover's assets via the APA entered on September 12, 2008.  (Decision at 4.)  The transaction closed on December 1, 2008.  (*Id*.)  The deal included an upfront cash payment to CCM at closing and contingent payments over five years following the closing of the transaction.  (*Id.*)  The contingent payments were "tied to the growth in revenues" of Clover.  (*Id.*)  CCM ultimately received approximately $18 million in Contingent Payments.  (*Id.*)

CCM alleges that Federated fraudulently induced Clover to be acquired, and that Federated did not engage in good faith efforts to market and distribute the Clover products – most notably, Clover's large cap mutual fund and investing strategy called "Clover Value" – during the Contingent Payment Period.  CCM alleges that Federated's marketing and sales efforts instead favored a different Federated fund, known as Strategic Value, which CCM alleges was a competitor of Clover Value.[4]  CCM asserts that this alleged lack of marketing and sales support was intended to and did substantially reduce the growth of net revenue generated by Clover's products and the Contingent Payments to CCM.  (*Id.* at 5; Compl.¶ 8.)

---

[4] Of course as the Court recognized, CCM needs to prove more than merely that Federated favored one fund over a Clover fund: "CCM must produce evidence from which a reasonable jury could find that Federated took steps intentionally calculated to minimize the Earnout Payments to CCM."  (Decision at 11.)

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

## C.      Federated's Sales and Marketing Efforts

Federated engaged in substantial and ongoing efforts to market and distribute Clover during the entirety of the Contingent Payment Period.  These efforts are set forth in Federated's interrogatory responses,[5] and supported by a robust evidentiary record.  As Federated will demonstrate at summary judgment, no reasonable jury could conclude that Federated acted fraudulently or in bad faith in the face of these undisputed facts.  Clover went into the deal with the understanding that Federated would continue to support its 100+ products other than the Clover products.  (Tambe Decl. ¶ 40, Tab L (Carl 30(b)(6) Tr. 42:8-22).)  Indeed, Mr. Jones conceded that Clover's allegation that Federated did not engage in any efforts to market the Clover products was simply wrong, and that, in fact, Federated did many things to market Clover's products.  (Tambe Decl. ¶ 38, Tab J (Jones Tr. 152:14-153:9, 155:7-12).)  A small portion of the record, which CCM's experts *entirely ignored*, is set forth below:

- **Creation of Mutual Funds:**  Prior to the acquisition, Clover did not distribute any mutual funds.  (Tambe Decl. ¶ 38, Tab J (Jones Tr. 42:9-15).)  Federated created, and in March 2009, launched the mutual funds to be managed by Clover: the Federated Clover Value Fund ("Clover Value") and the Federated Clover Small Value Fund ("Clover Small Cap") (together, the "Clover Mutual Funds").  (Tambe Decl. ¶ 4, Fed. Ex. 20 at 1; ¶ 7, Fed. Ex. 23.)  As conceded by Mr. Jones and Steve Carl, Clover's Chief Operating Officer, the creation of the Clover Mutual Funds required the expenditure of time, effort and money by Federated.  (Tambe Decl. ¶ 40, Tab L (Carl 30(b)(6) Tr. 118:14-119:2, 120:9-13).)

- **Touchstone Acquisition**: Also in 2009, Federated paid $3 million to acquire the two Touchstone mutual funds sub-advised by Clover, which was not required by the APA.  (Tambe Decl. ¶ 4; Fed. Ex. 20; Territ Decl. ¶ 4.)  By August 2009, Federated completed the reorganization of the funds, resulting in hundreds of millions of assets moving into Clover Value and Clover Small Cap.  (Tambe Decl. ¶ 4, Fed. Ex. 20 at 2-3; ¶ 10, Fed. Ex.

---

[5] Throughout this litigation, CCM has strived to avoid acknowledging the overwhelming record of Federated's marketing efforts.  Federated provided detailed responses to numerous interrogatories, including Interrogatory 8 which asked Federated to identify and describe in detail any plans or actions taken to market, sell or distribute the Clover Products.  (Tambe Decl. ¶ 45, Tab Q (Fed. Interrog. Resp).)  CCM ignored those responses during depositions.  CCM also had the opportunity to depose four designated representatives from Federated about "any plans or actions taken to market, sell or distribute the Clover Products," but chose to stick its head in the sand instead, *withdrawing* this 30(b)(6) topic CCM itself had initially listed.  (Tambe Decl. ¶ 46-47.)

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

27; ¶ 41, Tab Q (Fed. Interrog. Resp. 8(a)).)  The purchase of the Touchstone funds also
enabled the Clover Mutual Funds to disclose and market on the basis of a longer
performance history.  (Tambe Decl. ¶ 5, Fed. Ex. 21; ¶ 9, Fed Ex. 26; ¶ 45, Tab Q (Fed.
Interrog. Resp. 8(a)).)  Even Mr. Jones conceded Federated's considerable efforts in this
regard.  (Tambe Decl. ¶ 38, Tab J (Jones Tr. 64:22-65:3).)

- **Training:**  Federated devoted significant efforts to train its sales force regarding Clover.
  These efforts included: distributing comprehensive written documentation to Federated's
  sales force, placing Clover representatives in prominent speaking positions at a number
  of sales conferences, providing formal sales training sessions, and creating a compulsory
  test for all sales employees regarding the Clover products.  (Tambe Decl. ¶ 4, Fed. Ex. 20
  at Attachment D; ¶ 45, Tab Q (Fed. Interrog. Resp. 8(n)); ¶ 11, Fed. Ex. 32; ¶ 40, Tab L
  (Carl 30(b)(6) Tr. 131:9-18, 134:20-136:9).)

- **National Sales Conferences:** Federated annually holds a National Sales Conference
  ("NSC") to which the entire sales force is invited.  (Tambe Decl. ¶ 38, Tab J (Jones Tr.
  246:14-25).)  At the first NSC following the Acquisition, Jones and Clover Value portfolio
  manager Matt Kaufler were given a one-hour presentation slot before the entire
  sales force.  (Territ Decl. ¶ 19.)   Thereafter, Clover products were featured at *every* NSC
  during the Contingent Payment Period. (*Id.* at ¶¶ 17-19.)

- **Focus Funds**: Also at time of each NSC, the Broker Dealer and Wealth Management
  channels created "focus" lists of mutual funds and investment strategies.  In every year of
  the Contingent Payment Period, either the Clover Value, Clover Small Cap, and often
  both, were included on these focus strategy lists.  (Tambe Decl. ¶ 45, Tab Q (Fed.
  Interrog. Resp. No. 10); Territ Decl. ¶¶ 20-27.)

- **Assignment of Federated Employees to Sales and Marketing of Clover:**  Federated
  assigned former Clover employee Peter Smith to full-time sales and marketing efforts for
  the Clover products.  Smith travelled with Federated's sales force to meetings with
  clients, presented at NSCs and other meetings, provided training and product support to
  the entire sales force, and assisted in the preparation of marketing, sales and educational
  materials.  (Tambe Decl. ¶ 11, Fed. Ex. 32; ¶ 45, Tab Q (Fed. Interrog. Resp. 8(d)).)

- **Fund Marketing and Sales Materials/Literature**: Federated created and maintained
  numerous marketing, sales and educational materials for the Clover products, including
  Overview Sheets, Product Profile Sheets, Product Guides, Fund Snapshots, FAQs,
  Talking Points, PowerPoint presentations, post-card mailings, mass emails, and "Reasons
  to Own."  (Tambe Decl. ¶ 4, Fed. Ex. 20 at Attachment D; ¶ 45, Tab Q (Fed. Interrog.
  Resp. No. 8(f)).)  Also, Federated created and posted on its website videos and podcasts
  featuring Clover portfolio managers, arranged for media exposure for Jones and the
  Clover portfolio managers, and ran banner advertisements on its website.  (Tambe Decl.
  ¶ 4, Fed. Ex. 20 at Attachment D; ¶ 45, Tab Q (Fed. Interrog. Resp. 8(k)).)

- **Responses to Client RFIs, RFPs, DDQs**: During the Contingent Payment Period,
  Federated promoted Clover products in responding to several hundred requests for
  information (RFIs), requests for proposal (RFPs) and due diligence questionnaires

(DDQs) from investors.  (Tambe Decl. ¶ 4, Fed. Ex. 20 at Attachment C; ¶ 40, Tab L
(Carl 30(b)(6) Tr. 114:24-115:3, 115:24-116:13); ¶ 45, Tab Q (Fed. Interrog. Resp. 8(i)).)

- **Approval for Sale on Fund Platforms**: CCM concedes that Federated extended efforts
  to place the Clover products on the platforms of broker dealers and other intermediaries.
  (Tambe Decl. ¶ 38, Tab J (Jones Tr. 154:7-12, 203:15-20); ¶ 40, Tab L (Carl 30(b)(6) Tr.
  61:3-22).)  Federated was successful in placing Clover products on the platforms of over
  20 leading broker dealers and financial advisors.   (Tambe Decl. ¶ 4, Fed. Ex. 20 at
  Attachment B; ¶ 8, Fed. Ex. 25 at 1, 3-4; ¶ 45, Tab Q (Fed. Interrog. Resp. 8(g)); ¶ 40,
  Tab L (Carl 30(b)(6) Tr. 114:24-115:23); ¶ 38, Tab J (Jones Tr. 178:23-179:2, 179:12-
  17).)  Federated also succeeded in placing information on Clover products in over 25
  consultant databases.  (Tambe Decl. ¶ 45, Tab Q (Fed. Interrog. Resp. 8 (h)).)

- **White Papers:** Federated created a number of white papers (known as the "OnPoint
  Series") using material and quotes provided by Michael Jones and various analysts who
  worked on the Clover products.  (Tambe Decl. ¶ 45, Tab Q (Fed. Interrog. Resp. 8(p)).)

- **Voicemails:** Federated distributed voicemails recorded by Clover portfolio managers and
  Peter Smith, to inform and educate the Federated sales force about Clover products.
  (Tambe Decl. ¶ 45, Tab Q (Fed. Interrog. Resp. 8(s)).)

- **Client Interactions:** Over the Contingent Payment Period, Federated engaged in ***over
  75,000*** unique client interactions concerning Clover, including, among other things: one-
  on-one appointments, conference calls, faxes, group meetings, industry conferences,
  mailings, seminars and client appreciation events, and emails.  (Tambe Decl. ¶ 4, Fed Ex.
  20 at 5; Territ Decl. ¶¶ 15-16.)

### D.    Market Conditions During the Contingent Payment Period

At the closing of the Acquisition in December 2008, Mr. Jones fully understood that

"because of the declines in the markets, [Clover's] forecasted revenues were going to be in a

significant decline."  (Tambe Decl. ¶ 38, Tab J (Jones Tr. 339:11-341:15).)  Three days after the

transaction closed, Mr. Carl told all of the Clover employees that without the deal with

Federated, "Clover would not have been able to sustain our current employment levels" and Mr.

Carl could "only imagine the cost reduction measures we would have needed to implement had

we stayed independent."  (Tambe Decl. ¶ 17, Fed. Ex. 55; ¶ 40, Tab L (Carl Tr. 241:2- 242:3;

243:5-244:15).)  Also, CCM recognized it would be "starting in the hole" as compared to the

baseline revenue that Clover itself had proposed.  (Tambe Decl. ¶ 42, Tab N (Spector Tr. 126:6-

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

127:8); ¶ 6, Fed. Ex. 22.)

During the Contingent Payment Period, Mr. Jones frequently published commentary concerning dire market conditions and acknowledged the financial crisis and its impact on Clover's investment strategies.  In October 2008, Mr. Jones wrote, "By most measures, *this is the worst stock market since 1973-1974*."  (Tambe Decl. ¶ 12, Fed. Ex. 39; ¶ 38, Tab J (Jones Tr. 251:6-252:17).)  In September 2009, Mr. Jones described investors as "stagger[ing] into 2009 with rampant pessimism about the economy and investment markets," and noted that "many investors have *fled equities."*  (Tambe Decl. ¶ 13, Fed. Ex. 41; ¶ 38, Tab J (Jones Tr. 261:17-262:7).)  In December 2010, Jones wrote that investors' focus had shifted to minimizing risk, and that risk aversion was demonstrated in mutual fund flows.  (Tambe Decl. ¶ 15, Fed. Ex. 45; ¶ 38, Tab J (Jones Tr. 278:6-21).)  In July 2011, Jones wrote, "Since 2007, investors have been steadily liquidating their holdings of U.S. Equity mutual funds. They sold massive amounts at the bottom of the markets in 2008 – 2009 and they have continued selling even as stocks rebound in 2009 – 2011."  (Tambe Decl. ¶ 16, Fed. Ex. 47 at 10; ¶ 38, Tab J (Jones Tr. 287:15-288:14).)

Public data shows that for the first four years of the Contingent Payment Period, equity funds specializing in large public companies – such as Clover Value – had significant net outflows: investors were withdrawing money in the tens of billions.  (Tambe Decl. ¶ 35, Tab G) At the same time, public data revealed that billions of dollars were flowing into income yielding investments, such as Federated's Strategic Value Dividend Fund.  (*Id*.)

### E.    Post-2008 Investment Performance of the Clover Products

Both Clover Value and Clover Small Cap had poor performance during part or all of the Contingent Payment Period.  Clover Value was never in the top quartile of performers in its category between 2010 and 2013.  (Tambe Decl. ¶ 18, Ex. 60 at 7).  In 2010, Clover Value was in the *bottom* quartile in its category containing over 1200 funds: 75%, or over 800, of its peers

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

had superior performance.  (Tambe Decl. ¶ 18,  Fed. Ex. 60; ¶ 39, Tab K (Jones 30(b)(6) Tr. 38:14-19, 44:4-20, 46:3-21).)  The record is replete with admissions by Messrs. Jones, Carl and others concerning the poor investment performance of the Clover investment products.  For example, outlining possible investment process improvements, Mr. Carl acknowledged that "since acquisition" Clover Value had "mediocre performance in 2009 and very poor performance in 2010." (Tambe Dec. ¶ 14, Fed. Ex. 43; ¶ 38, Tab J (Jones Tr. 274:18-275:11 (Mr. Jones agreeing with Mr. Carl's statements)).)

Under Federated's management and consistent and extensive marketing and sales efforts, and notwithstanding the financial crisis, by the end of the Contingent Payment Period, Federated had achieved ***$1 billion in gross sales*** of the Clover Mutual Funds alone.  (Territ Decl. ¶ 10.) Adding in sales of other Clover products, gross sales over the five-year period exceeded $2 billion.  (*Id*. ¶¶  10-14.)  After a dip in 2009 in the immediate aftermath of the financial crisis, Clover's net advisory revenue grew substantially every single year – by 18%, 15.5%, 8.21 %, and 22% in years 2, 3, 4, and 5, respectively – reflecting an average rate of growth of 9% per year over the entire five-year time period.  (Tambe Decl. ¶ 29; MOL Tab A.)

Per the APA, Federated rewarded CCM for this growth in revenues, paying a total of $18,462,305 in Contingent Payments.  (Compl. ¶118.)  In contrast, Federated's own revenues ***decreased*** in four of the five years of the Contingent Payment Period.  (Territ Decl. ¶ 28.)

## II.    STEVEN POMERANTZ AND GLENN SHEETS

### A.    Steven Pomerantz's Opinions and Analysis

Dr. Pomerantz opines that Clover Value raised $3.9 billion fewer assets than it should have because Federated's marketing efforts favored a competing fund – Strategic Dividend. (Pomerantz Report at 11-12.)  Although dressed up in jargon and invented terminology, his opinion boils down to the following simplistic syllogism: (1) Clover Value and Strategic

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Dividend were competing funds; (2) the two funds should have raised assets over the relevant time period in some fixed proportion to one another; (3) that a group of 13 pairs of funds selected by Dr. Pomerantz establishes what that "industry norm" should have been; (4) Clover did not attract assets at the "industry norm", (5)  that was because Federated allegedly favored Strategic Dividend in its marketing efforts; and (6) but for Federated's alleged conduct, the assets allocated to Clover would have mirrored the "industry norm" and resulted in an additional $3.9 billion assets flowing to Clover Value.  The methodology as a whole is novel, untested, unreliable and internally inconsistent; indeed, **each and every** step is fatally flawed.

As a matter of logic and common sense, steps 5 and 6 simply do not flow from steps 1-4 because Dr. Pomerantz never examined the marketing and distribution of the Clover Value, Strategic Value or any of the other funds he claims to have analyzed.  Dr. Pomerantz admitted that he did not analyze marketing or causation and did not try to understand how or why any of these funds obtained their assets.  (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 33:3-34:3, 42:11-17, 193:7-12).)  In fact, he claimed to be "agnostic" about why any of these funds had raised assets. (*Id.* 106:7-9.)  However, his opinion is not agnostic; he opines that CCM was harmed – raised fewer assets – **because of** Federated's allegedly deficient marketing efforts.  (*See, e.g.,* Pomerantz Report at 11.)   That conclusion is contradicted by his own admissions.

The preliminary steps in his analysis fare no better.  As part of his analysis, he looked at the average assets in his "peer group" of 13 pairs of funds over the 4-year period from 2010 through 2013.[6]  He calculated the total assets allocated between the pairs of funds, one of which was purportedly like Clover Value and the other purportedly like Strategic Value.  From that comparison, across all funds and across the aggregate time period, he concluded that 44% of

---

[6] He conveniently ignores 2009, the year immediately following the financial crisis, during which Clover's revenues declined well below their target level as investors redeemed assets, few investors committed new money and the performance of the funds lagged, along with the broader equity markets.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

total assets raised by the combined Strategic Value and Clover Value funds should have been allocated to Clover Value and only 56% to Strategic Value.  Dr. Pomerantz opines that the actual allocation between the two funds did not match this supposed "average," because "Federated's sales efforts highly favored" Strategic Value over Clover products, which he claims is "evidenced" *solely* "by their respective asset growth."  (*Id.* at 6.)  Dr. Pomerantz thus purports to effect a fictional reallocation of $3.9 billion from Strategic Value to Clover Value, pretending as if investors who had actually invested in Strategic Value – a dividend yielding, monthly income producing investment strategy – instead would have invested their money in a value seeking, growth (and not income yielding) investment strategy.  (*Id.* at 7, 11 (mutual funds), 12 (applying the same approach, without any further analysis whatsoever, to the SMA[7] product).)[8]

This methodology is novel and untested.  (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 66:6-68:2).)  It is also unsupported by Dr. Pomerantz's own data.  Most of his pairs of "peer" funds raised funds at rates that were wildly divergent from the 56/44 split he urges upon this Court.  (Tambe Decl. ¶ 33; MOL Tab E.)  Dr. Pomerantz admits that his calculation has no predictive value:  "I don't expect anybody to look like the average."  (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 190:11-13).)  Moreover, his own data shows that Clover Value ranked squarely in the middle of the "Clover-like" funds he studied.  (Tambe Del. ¶ 33; MOL Tab E.)  Dr. Pomerantz's forced reallocation would put Clover second from the top of the peer funds.  (*Id.*)  Also, while he claims

---

[7] An SMA is a privately managed investment account opened through a broker/dealer or financial advisor that uses pooled money to buy individual assets for the investor.  (Territ Decl. ¶ 5.)  In an SMA, the investor owns the securities that make up the portfolio; in a mutual fund, it is the fund that owns the securities.  (*Id.*)

[8] Dr. Pomerantz's calculated average is based solely on data from mutual funds; he has no parallel data or analysis for applying that average to SMA products.  (Tambe Decl. ¶ 21, Pomerantz Report at 6-12.)  He admits that he did not have any peer company data for the SMA space.  (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 110:13-16).)  He justifies this by claiming that "the strategies underlying the SMAs are comparable to those underpinning the mutual funds."  (Tambe Decl. ¶ 21, Pomerantz Report at 12.)  He admits, however, that SMAs are different from mutual funds (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 110:21-112:9)), he is not aware of any other analysis or study that treated SMAs the same as mutual funds for allocation, (*id.* 112:22-113:4), and, he did not rely on any literature or study to support applying the average to the SMA product.  (*Id.* 171:10-17.)

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

that his methodology would ***increase assets*** for Clover, his own data reveal that it actually

***doubles*** Clover's ***loss of assets*** in 2013.

*Second*, Dr. Pomerantz opines that "Federated failed in its goal to sell the Clover Small

Cap fund as evidenced by the fact that . . . it remained far below its capacity for assets."

(Pomerantz Report at 5-6.)  His entire analysis is limited to just listing the ten largest small cap

funds in the industry.  (*Id.* at 21-22.)  Based on that list alone he concluded "the assets raised for

Clover Small Cap Value are far below its capacity as measured by the prevailing level of assets

under management."  (*Id.* at 22.)  That conclusion is unsupported by any analysis and flies in the

face of the undisputed facts.  Dr. Pomerantz admitted that he ignored the actual sales efforts of

Federated or the facts concerning the growth in assets of this fund – the fund attracted well over

$600 million in net assets.  He also admitted that he had "no opinion" on Clover Small Cap's

"distribution" and has "no idea" how its growth rate compares to other small cap funds.  (Tambe

Decl. ¶ 43, Tab O (Pomerantz Tr. 49:7-50:3).)  He conceded that his only "comments" about

Clover Small Cap are to "illustrate" that the top 10 biggest small cap funds have larger assets.

(*Id.* 43:15-45:9.)  He made clear "that's the only analysis I have" and he has "no opinion" on

"what that means for purposes of this case."  (*Id.* 43:15-44:11.)

### B.    Mr. Sheets's Opinions Incorporating Dr. Pomerantz's Opinions

Plaintiff offers the expert opinions of Mr. Sheets to calculate the revenues and Contingent

Payments, premised on the net asset sales opinions offered by Dr. Pomerantz.  (Tambe Decl.

¶ 27, Fed. Ex. 134 ("Sheets Report").)  Mr. Sheets created a model to try showing how additional

assets in Clover's large cap products would have translated to increased contingent payments for

CCM.  (*Id.* at 11-23.)  The additional assets in his model are pulled directly from the 44%

"industry average" allocation and $3.9 billion in Dr. Pomerantz's report.  (*Id.* at 14-15, 16, 18

("Based on the but-for proportionate fund flow estimate provided by Mr. Pomerantz, I have

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

developed a calculation of modified "but-for" contingent payments.").)  Plugging the $3.9 billion

into his model, Mr. Sheets calculates an increase in Clover's revenues that would trigger $37

million in additional Contingent Payments.  Like Dr. Pomerantz, Mr. Sheets concedes that he

offers no opinion on causation.  (Tambe Decl. ¶ 44, Tab P (Sheets Tr. 30:11-24).)[9]

## ARGUMENT

## I.    LEGAL STANDARD

CCM, as the proponent of expert evidence, has the burden of establishing admissibility

by a preponderance of the evidence.  *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Under Federal Rule of Evidence 702, CCM must show ***all*** of the following:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based upon sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; ***and***

(d) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (emphasis added).  Rule 702 requires a court to act as a gatekeeper of scientific

testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993).  "The

objective . . . is to ensure the ***reliability*** and ***relevancy*** of expert testimony."  *Kumho Tire Co. v.

Carmichael*, 526 U.S. 137, 152 (1999) (emphasis added); *Amorgianos v. National R.R.

Passenger Corp.*, 303 F.3d 256, 259 (2d Cir. 2002) (same; citing *Daubert*).

---

[9]Mr. Sheets does not rely upon Dr. Pomerantz to calculate the increase in Contingent Payments that would have resulted if Federated had agreed to Mass Mutual's demand to discount fees.  (Tambe Decl. ¶ 44, Tab P (Sheets Tr. 34:8-36:25).)  Mr. Sheets conceded that he has no opinion about whether Federated should have accepted that demand (*id.* at 30:11-24; 46:25-47:6), and he admitted he had not isolated the amount of additional Contingent Payments traceable solely to Mass Mutual.  (*Id.*)  In any event, even Mr. Carl recognized Mass Mutual's fee demand was "low to us."  (Tambe Decl. ¶ 40, Tab L (Carl 30(b)(6) Tr. 198:6-23, 201:18-202:1); ¶ 20, Fed. Ex. 67.)  Federated considered Mass Mutual's discount demand using an established rubric, guided by its business judgment, and made a counter-offer to Mass Mutual, that Mass Mutual declined.  No liability can arise here as a matter of law.  *See Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 16 (2d Cir. 2014) ("[T]he implied covenant [of good faith and fair dealing] does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract").

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

To satisfy the requirement of *relevancy*, CCM's expert opinions must meet the standard in Rule 401.  *Amorgianos*, 303 F.3d at 265.  Expert testimony is irrelevant as lacking probative value when it is based on fundamental statistical error or faulty assumptions.  *See, e.g.*, *Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997) (affirming exclusion of expert opinion as lacking probative value when, *inter alia* one of its "central conclusions . . . is premised on an elementary statistical error").[10]  Additionally, an expert opinion is only relevant it if has "fit," meaning the "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591.  For example, there is no "fit" when the opinion is a "complete break" or "detached" from the actual facts in the case.  *See, e.g.*, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (reversing and excluding an expert opinion that was contrary to facts); *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 511 F. App'x 54, 56-57 (2d Cir. 2013) (affirming exclusion because "expert testimony included sweeping statements that were detached from the actual evidence.").

To satisfy the requirement of *reliability*, CCM must demonstrate that "the testimony is the product of reliable principles and methods."  Fed. R. Evid. 702.  "[I]t is critical that an expert's analysis be reliable *at every step*."  *Amorgianos*, 303 F.3d at 267 (emphasis added). And, the "court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Id.*  Three distinct analyses are relevant here:

First, "expert testimony should be excluded if it is speculative or conjectural."  *Boucher*, 73 F.3d at 21; *see also MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).

---

[10] *See also Boucher*, 73 F.3d at 21 ("[I]f it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.") (citations and quotations omitted); *Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*, 910 F.Supp.2d 629, 640 (S.D.N.Y. 2012) (Where the "analysis rests on faulty assumptions, the trial court has discretion to exclude [the expert's] proffered testimony for lack of probative value.").

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

"Admission of expert testimony based on speculative assumptions is an abuse of discretion."
*Boucher*, 73 F.3d at 22.

*Second*, an expert opinion must be supported: there must be "a sufficiently rigorous analytical connection between [an expert's] methodology and the expert's conclusions." *Nimely v. City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005). "[N]othing in *Daubert* or the Federal Rules of Evidence requires a district court to admit expert opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157; *see also Roman v. Sprint Nextel Corp.*, No. 12-cv-276 (VEC), 2014 U.S. Dist. LEXIS 138951, at *16-18 (S.D.N.Y. Sept. 29, 2014) (excluding an expert based on *Kumho Tire*). If the expert's data or methodology "are simply inadequate to support the conclusions reached, [then] *Daubert* and Rule 702 *mandate* the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266 (emphasis added). To opine on causation, the expert must analyze and attempt to account for other possible causes. *See Raskin*, 125 F.3d at 67-68 (excluding an expert opinion of age discrimination that assumed any anomalies in the data must be caused by age discrimination and made "no attempt to account for other possible causes"); *see also Celebrity Cruises Inc. v. Essef Corp.*, 434 F.Supp.2d 169, 177-78 (S.D.N.Y. 2006) (same).

*Third*, for experts like Dr. Pomerantz and Mr. Sheets who have acquired their expertise through experience, the overarching test for reliability lies in determining whether the expert's testimony exhibits "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See, e.g., Kumho Tire*, 526 U.S. at 152. *See also Nimely*, 414 F.3d at 399 (same), *Lippe v. Bairnco Corp.*, 99 F. App'x 274, 278-279 (2d Cir. 2004) (same). This translates into several practical requirements, including that an expert must provide a "meaningful explanation" for each aspect of his methodology, including to verify that

-15-

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

a peer is actually comparable and to rely on any specific percentages.  *Lippe*, 99 F. App'x at 279 (expert failed to explain his foundation, including the reasons he used certain percentages and he claimed certain companies were comparable).  CCM's experts fail all of these tests.

## II.  THE OPINIONS OF DR. POMERANTZ SHOULD BE EXCLUDED

### A.  The  "Causation" Opinion Is Speculative and Unsupported

Dr. Pomerantz claims to conclude that Federated's sales and marketing efforts of Clover were inadequate, solely because he thinks those products should have received greater inflows of assets.  (Pomerantz Report at 6, 11, 12.)  However, this opinion is speculative and unsupported and should be excluded because Dr. Pomerantz admitted that he has no opinion on causation or marketing and that he did not actually analyze Federated's marketing efforts.

Dr. Pomerantz has no basis to opine that Clover's large cap products would have received more assets "[h]ad Federated raised new money" in accordance with his calculated average.  (*Cf. id.* at 11.)  He admits that he did not analyze, nor reach any conclusion regarding the sufficiency of Federated's large cap marketing efforts nor the efforts for other funds:

> Q. You weren't – just to be clear, you were not asked to opine on the sufficiency of the marketing efforts?
>
> A. Right.  The sufficiency, the quality, the quantity, I'm not – I wasn't asked to opine on that.  And my report doesn't address that.

(Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 33:21-34:3).)  He did not even "look at the discovery materials in this case that set forth what Federated did to . . . raise funds for the Clover products." (*Id.* 33:3-12.)  Rather, he admits that the only thing he looked at to measure Federated's sales efforts was "asset growth," (*Id.* 71:14-24), but he "was not asked to do an analysis to understand why the allocation came out the way it did."  (*Id.* 98:21-23.)  As a result, Dr. Pomerantz is "bereft of knowledge" regarding any marketing (by Federated or any other "peer" funds), so he "can do no more than conjecture whether" Federated's marketing was adequate or played a

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

causal role.  *See Beastie Boys v. Monster Energy Co.*, 983 F.Supp.2d 369, 374 (S.D.N.Y. 2014)

("Bereft of knowledge about the facts on which the *GoldieBlox* settlement was based, Thomas

can do no more than conjecture whether the terms (including the monetary component) of that

settlement are a fair or unfair proxy for the value of the implied license at issue here.").

   Moreover, Dr. Pomerantz admits that he did not analyze, and has no opinion regarding,

***causation*** or ***liability***.  He freely admits that he did not analyze, nor opine on, whether

Federated's marketing efforts actually ***caused*** any decreased flows into Clover products:

> Q. And you were not asked to look into causation either, correct?
>
> A. That's correct.
>
> Q. Okay.  And you express no opinion on causation, correct?
>
> A. That's correct.

(Tambe Decl. ¶ 43, Tab O, Pomerantz Tr. 193.)  Similarly, he admits that his "results do not

prove ***liability***," (*id.* 191:17-18), that he has no opinion on liability, and that he was not asked to

look into it.  (*Id.* 192:24-193:6.)  Dr. Pomerantz, thus, did not even attempt to account for other

causes, which is a basic requirement for a causation opinion.  *See, e.g.*, *Raskin*, 125 F.3d at 68

(excluding expert opinion because it made "no attempt to account for other possible causes").

   Absent an analysis of marketing or causation. Dr. Pomerantz's causation opinion is pure,

unsupported speculation and should be excluded.  *See, e.g.*, *Boucher*, 73 F.3d at 22 (reversing

admission of speculative expert testimony); *MLB*, 542 F.3d at 311 (expert's opinion speculative,

because it was a conclusory statement without evidentiary support, without any empirical

studies, and in a report that actually analyzed other issues).

### B.     Dr. Pomerantz's Own Data Does Not Support His Causation Opinion

   Not only did Dr. Pomerantz fail to look at marketing, but his own data does not support

his conclusion.  He concludes that on average, his "peer group" allocated 44% of assets to

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

products that he categorized as being like Clover's large cap fund – this is his "industry norm." (Pomerantz Report at 7, 11, 12.)  He applies that "norm," opining that Clover "should have received" or "should have been given," this 44% calculated flow.  (*Id.* at 5, 7, 9.)

Applying that "norm" to Clover, however, cannot be squared with Dr. Pomerantz's admissions.  He admitted that he doesn't expect any product to "look like" his average, (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 190:22-23)), so his average number is meaningless when applied to Clover and provides no support for this opinion.  In fact, he testified that two peer funds were "pretty close to the peer average" but he does not think that is relevant, calling it "just kind of an amusing anecdote."  (*Id.* 190:11-22; *see also id.* 77:23-78:17 ("[I]t would be a coincidence that there might be some advisor out there that happened to look exactly like the average.").)  CCM's demand for tens of millions of dollars cannot be premised on a methodology that concludes Clover's experience "should have" been a "coincidence" or an "amusing anecdote."

Indeed, Dr. Pomerantz's conclusion – that improved Federated marketing would have yielded a 44%/56% allocation of funds between Clover Value and Strategic Dividend – is contrary to his own data, in several ways.  Dr. Pomerantz's data shows that in 2013, Clover's assets would have been significantly *reduced* – not increased – with the 44% allocation he endorses.  (Tambe Decl. ¶ 31; MOL Tab C.)  He calculated Clover Value's actual "net cash flow" in 2013 at negative $107 million.  (Pomerantz Report at 7-8.)  However, when he applies his 44% average, the loss doubles, to flows of negative $214 million.  (*Id.* at 12.)  Thus, Dr. Pomerantz's own charts demonstrate the fundamental errors in his methodology.  It is "too great an analytical gap" – and one that certainly defies all common sense – to claim that if Federated

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

had "properly" marketed the Clover products, Clover would have experienced an even greater *outflow* of assets in 2013.  *See, e.g.*, *Roman*, 2014 U.S. Dist. LEXIS 138951, at *16-18.

Based on the experience of his "peer group," Dr. Pomerantz claims Clover should have received $1.9 billion in "new money."  (Pomerantz Report at 11.)  However, his own data show that the "new money" actually raised by Clover was smack in the middle of his "peer group:" (*See* Tambe Decl. ¶ 34, Tab F.)  Dr. Pomerantz's entire exercise is skewed heavily by a single fund: the Fidelity Fund.  That fund, however, is actually nothing like Clover Value.  In fact, Dr. Pomerantz conceded that the Fidelity Fund is ***closed to the investing public***; it can only be accessed by investment advisors who work within a specialized unit at Fidelity.  (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 55:8-15; 57:13-25); ¶ 28, Fed Ex. 158 (Fidelity Fund Prospectus).) Yet, that one fund drives the entire calculation.  Deleting it would ***reverse*** Dr. Pomerantz's purported allocation analysis and suggests a conclusion that Clover Value raised ***more funds*** than Dr. Pomerantz's methodology suggests it "should" have raised[11]:

| | "New Money" into Clover-Like Funds (millions) | "New Money" into Strategic Value-Like Funds (millions) | Clover-Like "Allocation" | Strategic Value-Like "Allocation" | "Modified Clover Flow" (millions) |
|---|---|---|---|---|---|
| **Modified Clover Flow With or Without Fidelity** | | | | | |
| **With Fidelity** | 4,129 | 17,530 | 44% | 56% | 1,962 |
| **Without Fidelity** | -4,195 | 19,844 | -1055% | 1155% | -46,726 |

(*See* Tambe Decl. ¶ 36, Tab H; ¶ 22, Fed. Ex. 129 at Col. K (calcs. of "new money").)

----

[11] In fact, deleting just *one year* of the Fidelity Funds' data (2010) completely reverses Dr. Pomerantz's analysis.  Dr. Pomerantz calculates that in 2010, the Clover-Like Fidelity Fund received $5,518 billion in "new money."  (*See* Tambe Decl. ¶ 22, Fed. Ex. 129 at K20.)  If this one year of data is removed from Dr. Pomerantz's calculation, then  the total "new money" into Clover-Like funds becomes *negative -$1,389 billion* and his analysis would therefore conclude that Clover Value should have received *even less flow than it actually did.*

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Ultimately, Dr. Pomerantz's own data and calculations reveal that the asset allocation for

Clover Value versus Strategic Value – even assuming that comparison is valid – was entirely

consistent with the allocations he calculated for each of the other 13 pairs of funds.  He cannot

bridge the gap between this data and his conclusion.  *See, e.g., Roman*, 2014 U.S. Dist. LEXIS

138951, at *16-18 ("[H]is own *ipse dixit* is insufficient to tie his replication and extrapolation to

the facts of this case; he is therefore precluded from offering these opinions at trial.").

### C.    Dr. Pomerantz's "Peer Group" Composition Is Flawed

There are additional reasons that Dr. Pomerantz's methodology is unreliable: it is

premised on a novel, untested and fundamentally flawed construction of 13 pairs of funds that he

refers to as a "peer group."[12]   *First*, he uses a different peer group for his cash flow analysis

than for his performance analysis, without justification.  (*Compare* Pomerantz Report at 10

(listing peers for the cash flow analysis) *with id.* at 18-19 (listing peers for performance analysis

including 6 funds that were not used in the cash flow analysis).)  *Second*, Dr. Pomerantz defined

his groups inconsistently, placing some funds with similar descriptions in different categories,

while placing other funds with very different descriptions in the same category.  *Third*, he did not

account for whether any of the peer funds grew through mergers or acquisitions, even though he

omitted Clover assets that increased due to an acquisition or merger.  (Tambe Decl. ¶ 43, Tab O

(Pomerantz Tr. 50-51, 53, 104:10-105:22 ("I don't want to incorporate the assets acquired by

merger for the subject funds into my analysis.")).)  *Fourth*, Dr. Pomerantz did not control for the

fact that some of his "peer" funds are sold on different terms than the Clover funds, including

that some "peer" funds are not sold to the investing public, so the investors "don't make a

---

[12] Dr. Pomerantz admitted that he does not know of "any industry analysis," "any study," or "anyone" that uses the cash flow methodology underpinning his 44%/56% "industry norm" and he has not conducted this analysis for any other engagement.  (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 66:6-68:2).)  Similarly, he is not familiar with and could not identify anyone who has calculated "industry norm" the way he did in this case.  (*Id.* 84:7-23.)  Such novel opinions should be excluded as unreliable.  *See, e.g., In re MTBE*, 2008 U.S. Dist. LEXIS 44216, at *15.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

conscious decision to pick this fund." (*Id.* 54:16-57:25.)  Therefore, his "peer group" is also

inadmissible.  *See, e.g.*, *Raskin*, 125 F.3d at 67 (affirming exclusion because expert did not

account for fundamental differences in the comparison group); *Celebrity Cruises*, 434 F.Supp.2d

at 180 (excluding expert for "failure to justify the purported relation between the performance of

the proxies and that which would have been expected for Celebrity").  "Indeed, it is axiomatic

that, when designing an experiment to test whether an observed result was caused by [a] given

variable, the control or benchmark group must lack that variable.  That is the whole point of a

control group."  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 U.S. Dist LEXIS

16034, at *16-17 (S.D.N.Y. Feb. 10, 2015); *see also id.* at 23-24 ("Vandell simply assumes the

cleanliness of the benchmark.  Under *Daubert* scrutiny, something as fundamental to his analysis

as the quality of his control group cannot be assumed.").

### D.    Dr. Pomerantz's Methodology Is Unreliable

Dr. Pomerantz's causation opinion also should be excluded as irrelevant and unreliable

because his math does not work. Underlying Dr. Pomerantz's causation opinion is his attempt to

calculate the flow of assets into the Clover large cap products.  (*See, e.g.*, Pomerantz Report at

6.)  However, he does not actually analyze the inflows of new money from purchases of new

shares into any products (as opposed to outflows from investors removing money from the

investment).  Indeed, he admitted that he could not distinguish between the inflows and outflows:

"all you could basically determine is net cash flow.  You can't tell how much money is coming

in and how much money is going out.  All you see is the net."  (Tambe Decl. ¶ 43, Tab O

(Pomerantz Tr. 51:25-52:6; *see also id.* 75:2-13 ("I can't differentiate the positive from the

negative.")).)[13]  As a result, he is not actually measuring what he claims to measure, which is the

---

[13] Such data was available in both documents produced in this litigation and in Federated's public filings.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

most basic statistical error.  *See, e.g., Raskin*, 125 F.3d at 67 (expert's opinion "that no one over the age of 50 was promoted during the relevant time period" was "premised on an elementary statistical error," namely failing to account for the employees who turned 50 during the time period before they were promoted); *see also Fed. Hous. Fin. Agency*, 2015 U.S. Dist LEXIS 16034, at *18 ("[F]ailure to control for the one variable under review warrants exclusion.").

More fundamentally, because he does not control for outflows, his math is subject to substantial changes based on outflows, making his methodology wholly irrelevant and unreliable.  In fact, even minor changes in the outflows substantially alter his calculations.[14]  To demonstrate this, we can apply his method and hold everything in his equation constant, including all of the information about the peer group for Clover Value, except we change the amount of fund redemptions for his Strategic Value peer group.  Holding everything else constant, if there were an 8% drop in redemptions to the Strategic Value peer group (from 26 to 24) the average allocation for Clover's peer group would change by over 40%, from 83.6% to 124.1%.  (Tambe Decl. ¶ 30; MOL Tab B.)  In other words, his model can be driven entirely by a variable – investor redemptions – other than the variable he claims to be measuring – effectiveness of marketing.  That dooms his opinion.[15]  *See, e.g., Raskin*, 125 F.3d at 67; *Celebrity Cruises*, 434 F.Supp.2d at 186 ("A methodology so sensitive to one highly subjective variable lacks the necessary reliability."); *see also Fed. Hous. Fin. Agency*, 2015 U.S. Dist

---

[14] Dr. Pomerantz does not control for many other variables that affect his calculations.  He ignored that some funds' assets increased due to mergers and acquisitions.  For example, his peer group includes a Pioneer fund that had $92 million in assets at the end of 2012 but had $1.2 billion in assets at the end of 2013 because of a $1.458 billion reorganization.  (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 140:5-143:12); ¶ 24, Fed. Ex. 131 (2013 Annual Report).)  Dr. Pomerantz admitted that this increase in assets (and any similar increases) factored into his calculation of the 44% allocation and that he did not analyze the affect such increases had on his analysis.  (Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 145:4-147:1).)  For this reason too, Dr. Pomerantz's opinion should be excluded.  *See, e.g., Lippe*, 99 F. App'x at 279 (affirming exclusion of expert who failed to "offer a meaningful explanation" of his variables and assumptions).

[15] Moreover, it is nonsensical that by decreasing redemptions to the Strategic Value peer group and holding everything else constant, the allocation for Clover's peer group increases and the allocation for Strategic Value's peer group decreases.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

LEXIS 16034, at *18 ("[F]ailure to control for the one variable under review warrants

exclusion.").

Dr. Pomerantz also glosses over the year-to-year variability in his own cash flow

calculations by calculating his "average" on a four-year ***aggregate*** basis.  However, he must

analyze these substantially different annual flows and provide "a meaningful explanation" before

he can conclude that the total flows were caused by a failure of marketing.  *Lippe*, 99 F. App'x at

279 (expert failed to explain his foundation, including the reasons he used certain percentages

and he claimed certain companies were comparable).  In fact, simply using his own data to

calculate flows year-by-year destroys his analysis completely.  (Tambe Decl. ¶ 32; MOL Tab D.)

Once again, there is too great an analytical gap between the data and Dr. Pomerantz's

conclusions.  *See, e.g.*, *Roman*, 2014 U.S. Dist. LEXIS 138951, at *16-18.

**E.     Dr. Pomerantz's Small Cap Opinion Should Not Be Admitted**

Dr. Pomerantz also purports to opine on Federated's sales of Clover Small Cap, claiming

that "Federated failed in its goal to sell the Clover Small Cap fund ***as evidenced by*** the fact that .

. . it remained far below its capacity for assets."  (Pomerantz Report at 5-6 (emphasis added).)

However, he has no support for that opinion.  His work is limited solely to listing the largest

funds without any meaningful comparison to Clover Small Cap.  Moreover, this opinion is

completely irrelevant, because there is no allegation in this case that Federated was obligated to

make Clover Small Cap the largest such fund in the country.  *See, e.g.*, *Celebrity Cruises*, 434

F.Supp.2d at 177 (excluding expert testimony that would have been relevant only to issues that

were not disputed or raised).

Dr. Pomerantz did no analysis of the sales, marketing or growth of Clover Small Cap.

Once again, he admits that he has no relevant opinion and no basis for any opinion on

Federated's sales efforts:

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

> Q.  Okay.  And you have no opinions on Federated's level of marketing and distribution of the small cap product, correct?
>
> A. No.  My comments about small cap are – are just what's listed in – in paragraph seven, just in general terms addressing the assets in small value and illustrating a number of competitors that have significantly larger asset levels.
>
> Q. So what?
>
> A. That's – that's the only analysis I have, that I've – that I've done regarding the small cap product.
>
> Q. All right.  And you express no opinion on what that means for purposes of this case, that there are competitors that have larger asset sizes, correct?
>
> A. I – I have no opinion on that.

(Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 43:15-44:11; *see also* 49:7-15 (admitting he has "no opinion on its distribution."))).)  He also did not look at the marketing and distribution of the other small cap funds.  (*Id*. 47:15-20.)  Once again, he is "bereft of knowledge" regarding any small cap marketing (by Federated or any other funds), so he "can do no more than conjecture whether" Federated failed in its sales efforts.  *See Beastie Boys*, 983 F.Supp.2d at 374.

His entire analysis is that in December 2013 Clover Small Cap had $642 million in assets under management, whereas the 10 largest small cap funds on a Morningstar list each had over $2 billion.  (Pomerantz Report at 21-22; ¶ 43, Tab O (Pomerantz Tr. 44:12-24).)  However, he did no analysis of those funds or how they compare to Clover.  For example, he admitted that he has "[n]o idea" whether Clover Small Cap grew faster or slower than the other funds.  (*Id.* at 49:7-50:3.)  Moreover, he does not explain how this sample is representative of a group with "maybe at least 100" funds, including funds with only $100,000.  (*Id.* 45:10-46:16.)  The law precludes him from presenting such unsupported speculation to the jury.  *See, e.g., Boucher*, 73 F.3d at 22; *MLB,* 542 F.3d at 311.  Indeed, he "merely compiled market data and then offered his

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

conclusions, yet he has failed to explain the relationship between the two." *In re MTBE*, 2008
U.S. Dist. LEXIS 44216, at *11 (S.D.N.Y. June 5, 2008).

## III.    THE OPINION OF MR. SHEETS SHOULD BE EXCLUDED

Mr. Sheets's damages model is "[b]ased on" the allocation "estimate provided by Mr.
Pomerantz." (Tambe Decl. ¶ 27, Sheets Report at 15.) He plugs the results of Dr. Pomerantz's
56%/44% calculated allocation straight into his model. Mr. Sheets cannot rely on, and cannot be
a vehicle to deliver to the jury, Dr. Pomerantz's inadmissible opinions. *Fed. Hous. Fin. Agency*,
2015 U.S. Dist LEXIS 16034, at *36 ("In light of the conclusion that Vandell's testimony must
be excluded under Rule 702 and *Daubert*, any testimony of Riddiough's that relies on any of
Vandell's analysis must also be excluded."); *Israel v. Springs Indus.*, 2006 U.S. Dist LEXIS
80863, at *49-53 (E.D.N.Y Nov. 3, 2006) (excluding portions of damages expert's opinion that
were "based entirely" on another expert's excluded opinion). Moreover, because Mr. Sheets
relied on Dr. Pomerantz's allocation and did not conduct his own allocation analysis, that portion
of Mr. Sheets's opinion should be excluded as unreliable. *See, e.g., Kozar v. Sharp Elecs. Corp.*,
2005 U.S. Dist. LEXIS 49384, *8, (W.D. Pa. Sept. 30, 2005) (excluding expert's opinion
because his "wholesale reliance" on another expert's excluded opinion, "together with his failure
to conduct any testing, impugns the reliability of his opinion.").

## CONCLUSION

Federated respectfully requests that the Court enter an order granting the relief requested
herein; and such other and further relief as the Court may deem proper.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Dated: August 4, 2015
        New York, New York

Respectfully submitted,

/s/ Jayant W. Tambe
JONES DAY
Jayant W. Tambe
Tracy V. Schaffer
222 East 41st Street
New York, New York  10017
Telephone:      (212) 326-3685
Facsimile:      (212) 755-7306
jtambe@jonesday.com
tschaffer@jonesday.com


Jeffrey D. Baltruzak
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania  15219-2514
Telephone:  (412) 391-3939
Facsimile:   (412) 394-7959
jbaltruzak@jonesday.com

*Attorneys for Federated Investors, Inc.*

Tab A



*Amendment No. 1 to the APA defined the Starting Revenue (Non-Fixed Income) as $12,860,000.

(Tambe Declaration, Tab A.)

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

# Federated Clover Revenue Growth

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Net Investment Advisory Revenue** | $10,769,853 | $12,796,896 | $14,780,356 | $15,994,189 | $19,574,193 |
| **Growth from Previous Year** | -16.25% | 18.82% | 15.50% | 8.21% | 22.38% |
| **Growth from Starting Revenue (Non-Fixed Income)** | -16.25% | -0.49% | 14.93% | 24.37% | 52.21% |
| **CAGR** | -16.3% | -.2% | 4.7% | 5.6% | 9.0% |
| **Contingent Payment** | 0 | 0 | $5,867,969 | $3,365,471 | $9,228,865 |

*Amendment No. 1 to the APA defined the Starting Revenue (Non-Fixed Income) as $12,860,000

(Tambe Declaration, Tab A.)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Tab B

# Hypothetical Pomerantz Calculations

| Hypothetical #1 | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Fund** | **Beginning Assets** | **Gross Sales** | **Redeemed** | **"New Money"** | **Return** | **Final Assets** | **"New Money" divided by Average Assets** | **"Allocation of New Money"** |
| **Clover-Like** | 100 | 25 | 30 | –5 | 1.0% | 96 | -5.1% | 83.6% |
| **Strategic Value-Like** | 100 | 25 | 26 | –1 | 1.0% | 100 | -1.0% | 16.4% |

| Hypothetical #2 | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Fund** | **Beginning Assets** | **Gross Sales** | **Redeemed** | **"New Money"** | **Return** | **Final Assets** | **"New Money" divided by Average Assets** | **"Allocation of New Money"** |
| **Clover-Like** | 100 | 25 | 30 | –5 | 1.0% | 96 | -5.1% | 124.1% |
| **Strategic Value-Like** | 100 | 25 | 26 | +1 | 1.0% | 102 | .99% | -24.1% |

*The above charts show the output of Dr. Pomerantz's allocation formula using hypothetical data.   Gross sales do not change between the two hypotheticals. Redemptions to the Strategic Value-Like Fund decrease from Hypothetical #1 to Hypothetical #2.  Using Dr. Pomerantz's allocation formula, the "Allocation of New Money" to the Strategic Value-Like Fund decreases from Hypothetical #1 to Hypothetical #2, even though its gross sales are constant and it redemptions decrease.

(Tambe Declaration, Tab B.)

CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

Tab C

# Pomerantz's Modified Clover Flow Calculation

| Clover Value | Year End Assets | Return | Annual New Money |
|---|---|---|---|
| 2009 | $687 | | |
| 2010 | $913 | 11% | $152 |
| 2011 | $861 | 2% | -$68 |
| 2012 | $855 | 15% | -$131 |
| 2013 | $1,028 | 33% | -$107 |
| Cumulative Return >>> | | 171% | |
| Total of New Money >>> | | | -$154 |

| | Assets | Clover Flow | Federated Flow | Modified Clover Flow |
|---|---|---|---|---|
| 2009 | $687 | | | |
| 2010 | $913 | $152 | $1,322 | $586 |
| 2011 | $861 | -$68 | $2,824 | $1,251 |
| 2012 | $855 | -$131 | $798 | $353 |
| 2013 | $1,028 | -$107 | -$484 | -$214 |

*The above tables are from the Pomerantz Report.  (*See* Tambe Decl. ¶ 22, Pomerantz Report at 7, 12.)  In the top table, Dr. Pomerantz finds "Annual New Money" by calculating the net cash flow into Clover Value. (*See* Tambe Decl. ¶ 43, Tab O (Pomerantz Tr. 51:25-52:6).)  In the bottom table, Dr. Pomerantz finds the "Modified Clover Flow" for each year by multiplying his 44% "Clover-like" allocation number by his determination of the total annual "Federated Flow."  In 2013, the "Modified Clover Flow" is *lower* than the actual "New Money"  that went into Clover Value.

(Tambe Declaration, Tab C.)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Tab D

8

# Applying Annual "Allocations"

| | Clover-Like Annual Flow[1] | Strategic Value-Like Annual Flow[1] | Clover-Like Annual "Allocation"[2] | Strategic Value-Like Annual "Allocation"[3] | "Clover Flow"[4] (millions) | "Federated Flow"[4] (millions) | "Modified Clover Flow"[5] (millions) |
|---|---|---|---|---|---|---|---|
| **Modified Clover Flow Applying Annual Allocations** | | | | | | | |
| **2010** | 14% | 7% | 65% | 35% | 152 | 1,322 | 863 |
| **2011** | -12% | 12% | -4067% | 4167% | -68 | 2,824 | -114859 |
| **2012** | -9% | 6% | 249% | -149% | -131 | 798 | 1988 |
| **2013** | 19% | -3% | 115% | -15% | -107 | -484 | -558 |
| **Total** | | | | | | | -112566 |

[1] "New Money" ÷ Average Assets
[2] Clover-Like Annual Flow ÷ (Clover-Like Annual  Flow + Strategic Value-Like Annual Flow)
[3] Strategic Value-Like Annual Flow ÷ (Clover-Like Annual  Flow + Strategic Value-Like Annual Flow)
[4] Tambe Decl. ¶ 22, Pomerantz Report at 12.
[5] Tambe Decl. ¶ 22, Pomerantz Report at 12.
[6] (Clover-Like Annual Allocation) x (Federated Flow)

(Tambe Declaration, Tab D.)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Tab E

# Fund-by-Fund "Allocation"

| Flows and Allocation by Fund Family | | | | |
|---|---|---|---|---|
| | Clover-Like Flow[1] | Strategic Value-Like Flow[1] | Clover-Like "Allocation"[2] | Strategic Value-Like "Allocation"[3] |
| **Allianz** | -110% | -27% | 81% | 19% |
| **BlackRock** | -77% | 79% | -3080% | 3180% |
| **Allicane Bernstein** | -71% | 106% | -206% | 306% |
| **Nuveen** | -50% | 22% | 182% | -82% |
| **John Hancock** | -33% | 9% | 135% | -35% |
| **American Century** | -29% | 8% | 136% | -36% |
| **Federated[4]** | -18% | 99% | -22% | 122% |
| **Hartford** | 2% | -23% | -8% | 108% |
| **Columbia** | 21% | 30% | 41% | 59% |
| **Principal** | 47% | 43% | 52% | 48% |
| **T Rowe Price** | 74% | -5% | 107% | -7% |
| **JP Morgan** | 78% | 226% | 26% | 74% |
| **Fidelity** | 124% | -91% | 370% | -270% |
| **Pioneer** | 350% | -5% | 102% | -2% |

[1] New Money ÷ Average Assets
[2] Clover-Like Flow ÷ (Clover-Like Flow + Strategic Value-Like Flow)
[3] Strategic Value-Like Flow ÷ (Clover-Like Flow + Strategic Value-Like Flow)
[4] As calculated by Dr. Pomerantz. (Tambe Decl. ¶ 22, Pomerantz Report at 8-9).

(Tambe Declaration, Tab E.)