UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CCM ROCHESTER, INC., f/k/a CLOVER CAPITAL
MANAGEMENT, INC.,

                            Plaintiff,

                -v-

FEDERATED INVESTORS, INC.,

                          Defendant.

Index No. 14-cv-3600 (VEC)

**ECF CASE**

---

# PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S *DAUBER* MOTION

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York  10019
(212) 506-1700
(212) 506-1800 (fax)

*Attorneys for Plaintiff*
*CCM Rochester, Inc., f/k/a Clover Capital Management, Inc.*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

CLOVER'S EXPERTS ....................................................................................... 4

I.     DR. POMERANTZ'S OPINIONS ............................................................. 4

     A.     The Asset Allocation Opinion ......................................................... 4

     B.     The Performance Opinion ................................................................ 6

     C.     The Capacity Opinion ..................................................................... 7

II.     GLENN SHEETS'S OPINION ................................................................. 8

ARGUMENT ..................................................................................................... 8

I.     THE STANDARD FOR THE ADMISSIBILITY OF EXPERT TESTIMONY ............... 8

II.     DR. POMERANTZ'S OPINIONS ARE ADMISSIBLE ................................. 12

     A.     Dr. Pomerantz's Asset Allocation Opinion Is Reliable ...................... 12

               1.     Dr. Pomerantz's Opinions Are Based Upon Reliable Data ..................... 14

               2.     Dr. Pomerantz's Opinions Are Based Upon A Reliable Methodology ............................................................... 17

                      a.     Dr. Pomerantz's Method Of Selecting Peer Groups Is Reliable ....................................................... 18

                      b.     Federated's Other Challenges to the Reliability of Dr. Pomerantz's Methodology Have No Merit ................................. 20

     B.     DR. POMERANTZ'S OPINIONS ARE RELEVANT ....................................... 22

III.     MR. SHEETS'S TESTIMONY IS ADMISSIBLE ........................................ 24

CONCLUSION ................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
    514 F. Supp. 2d 571 (S.D.N.Y. 2007)......................................................................23

*523 IP LLC v. CureMD.Com*,
    48 F. Supp. 3d 600, 643-44 (S.D.N.Y. 2014) ........................................................10

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2014 U.S. Dist. LEXIS 180914 (E.D.N.Y. Oct. 15, 2014)..........................10, 11, 13

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)..................................................................... *passim*

*Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.*,
    2010 U.S. Dist. LEXIS 114440 (S.D.N.Y. Oct. 13, 2010) ....................................24

*Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*,
    910 F. Supp. 2d 629 (S.D.N.Y. 2012)..................................................................10

*Beastie Boys v. Monster Energy Co.*,
    983 F. Supp. 2d 369 (S.D.N.Y. 2014)..................................................................13

*In re Blech Sec. Litig.*,
    2003 U.S. Dist. LEXIS 4650 (S.D.N.Y. Mar. 26, 2003) ......................................10

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996)................................................................................10, 20

*Boyce v. Soundview Tech. Grp., Inc.*,
    464 F.3d 376 (2d Cir. 2006)........................................................................1, 22, 23

*Celebrity Cruises, Inc. v. Essef Corp.*,
    434 F. Supp. 2d 169 (S.D.N.Y. 2006)..............................................................10, 23

*Coastal Power Int'l v. Transcon. Capital Corp.*,
    10 F. Supp. 2d 345 (S.D.N.Y. 1998)....................................................................24

*Concord Camera Corp. v. Fuji Photo Film Co.*,
    2000 U.S. Dist. LEXIS 10338 (S.D.N.Y. July 24, 2000) ......................................14

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993)............................................................................... *passim*

*EEOC v. Venator Grp.*,
   2002 U.S. Dist. LEXIS 1724 (S.D.N.Y. Feb. 5, 2002) ....................................................11, 20

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   2015 U.S. Dist. LEXIS 16034 (S.D.N.Y. Feb. 10, 2015) .................................................11, 25

*In re Fosamax Prods. Liab. Litig.*,
   645 F. Supp. 2d 164 (S.D.N.Y. 2009) ............................................................................2, 9, 20

*Hart v. Rick's Cabaret Int'l, Inc.*,
   60 F. Supp. 3d 447, 467 (S.D.N.Y. 2014) ........................................................................9, 15

*IBM Corp. v. BGC Partners, Inc.*,
   2013 U.S. Dist. LEXIS (S.D.N.Y. Apr. 25, 2013) ..................................................................9

*Israel v. Springs Industries, Inc.*,
   2006 U.S. Dist. Lexis 80863 (E.D.N.Y. Nov. 3, 2006) ........................................................11

*Khadera v. ABM Indus. Inc.*,
   2011 U.S. Dist. LEXIS 149021 (W.D. Wash. Dec. 28, 2011) ...............................................16

*Kozar v. Sharp Electronics Corp.*,
   2005 U.S. Dist. Lexis 49384 (W.D. Pa. Sep. 30, 2005) .......................................................11

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) .............................................................................................................11

*Lesser ex rel. Lesser v. Camp Wildwood*,
   282 F. Supp. 2d 139 (S.D.N.Y. 2003) ..................................................................................24

*Lidle v. Cirrus Design Corp.*,
   2010 U.S. Dist. LEXIS 67031 (S.D.N.Y. July 6, 2010) .......................................................24

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
   2015 U.S. Dist. LEXIS 42630 (S.D.N.Y. Mar. 31, 2015) ....................................................24

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ................................................................................................22

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   2008 U.S. Dist. LEXIS 44216 (S.D.N.Y. 2008) ..................................................................18

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013) ..................................................................................................23

*Colon ex rel. Molina v. BIC USA, Inc.*,
   199 F. Supp. 2d 53 (S.D.N.Y. 2001) .....................................................................................9

*Olin Corp. v. Certain Underwriters at Lloyd's London*,
    468 F.3d 120 (2d Cir. 2006).................................................................9

*Pernet v. Peabody Eng'g Corp.*,
    20 A.D.2d 781 (1st Dep't 1964) .........................................................7

*Raider v. Friedman*,
    162 A.D.2d 112 (1st Dep't 1990) .......................................................15

*Raskin v. Wyatt Co.*,
    125 F. 3d 55 (2d Cir. 1996)................................................................22

*Roman v. Sprint Nextel Corp.*,
    2014 U.S. Dist. LEXIS 138951 (S.D.N.Y. Sep. 29, 2014)............................ *passim*

*Serv. Source v. Office Depot, Inc.*,
    2005 U.S. Dist. LEXIS 47948 (E.D. Mich. Nov. 28, 2005) ................................24

*In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
    842 F. Supp. 2d 614 (S.D.N.Y. 2012)............................................. *passim*

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004)..........................................11, 13

*U.S. v. Morgan*,
    53 F. Supp. 3d 732, 741-42 (S.D.N.Y. 2014) ........................................9

*Unigard Sec. Ins. Co. v. N. River Ins. Co.*,
    4 F.3d 1049 (2d Cir. 1993).................................................................7

*In re Vitamin C Antitrust Litig.*,
    2012 U.S. Dist. LEXIS 181158 (E.D.N.Y. Dec. 20, 2012) .........................17, 18, 21

*Washington v. Kellwood Co.*,
    2015 U.S. Dist. LEXIS 63457 (S.D.N.Y. Apr. 21, 2015)..........................10, 16, 18

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*,
    LLC, 513 Fed. Appx. 30 (2d Cir. 2013) ............................................24

**Other Authorities**

Rule 401 of the Federal Rules of Evidence ..............................................11

Rule 702 of the Federal Rules of Evidence .............................................8, 11, 23, 24

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

Plaintiff CCM Rochester, Inc., f/k/a Clover Capital Management, Inc. ("Clover"), respectfully submits this memorandum of law in opposition to the motion of defendant Federated Investors, Inc. ("Federated") to exclude certain opinions and proposed testimony of Steven J. Pomerantz, Ph.D and Glenn C. Sheets.[1]

## PRELIMINARY STATEMENT

The evidence adduced in discovery demonstrates[2] that Federated promoted its own "in-house" large cap value product, Federated's Strategic Value Dividend Fund ("Strategic Value"), at the expense of a "foreign" large cap value product, Clover's Large Value Fund ("Clover Value"), in order to minimize Clover's earnout payments under the Asset Purchase Agreement (the "APA"),[3] until, of course, the earnout period was essentially over[4] -- far too late for Clover to earn even one-third of the total maximum earnout.  As a direct and proximate result, Clover Value suffered a net *loss* of $154 million in assets under management during the earnout period, while Strategic Value experienced a net gain of $4.614 *billion*.

Clover's expert witnesses, Dr. Pomerantz and Mr. Sheets, will provide the jury with, among other things, a "stable foundation for a reasonable estimate" of Clover's damages.  *Boyce*

---

[1] Submitted in support of Clover's opposition to Federated's *Daubert* motion is the declaration of Trevor J. Welch, dated September 4, 2015 ("Welch Declaration").  "Ex. _" refers to exhibits to the Welch Declaration.

[2] Although Federated attempts to shoehorn its summary judgment arguments into its *Daubert* motion (Br. at 1-9), Clover will only touch on those arguments here and respond fully in opposition to Federated's actual summary judgment motion.

[3] *See, e.g.*, Ex. 3 ("sales force['s] sole focus [is] on the Strategic Value product"); Ex. 4 ("not to beat a dead horse, but [Federated's internal promotion to its sales force of Strategic Value over Clover Value] is exactly what we were so frustrated about"); Ex. 5 (Federated's refusal to generate marketing materials for Clover Value "classic example of them holding us back"); Ex. 6 (Federated's "honest answer [as to why it refused to generate marketing materials is] there [has] not [been] a focus on [Clover Value]").

[4] *See, e.g.*, Ex. 7 (in middle of earnout period, Federated admits it has not "taken [Clover Value] to market yet"); Ex. 8 (two-thirds of the way through the earnout period, Clover "hope[s] [Federated] has [Clover Value] in some searches by now"); Ex. 9 (in the last year of the earnout period, Federated about to "*begin* the process of positioning the Clover Value Fund" for sale among large cap value products, including Strategic Value) (emphasis supplied); Ex. 10 (months before the end of the earnout period, "Clover Value Fund is getting *teed up* to be emphasized by the sales force") (emphasis supplied)

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

*v. Soundview Tech. Grp., Inc*., 464 F.3d 376, 391-92 (2d Cir. 2006) (quotations and citation omitted).  Specifically, Dr. Pomerantz constructed a peer group of all advisors offering both Strategic-like and Clover-like funds to determine the average asset allocation between such funds during the earnout period.  Dr. Pomerantz then calculated that, had Federated raised assets at a rate commensurate with other advisors in the market managing funds with a similar management profile and performance record to the funds at issue, Clover Value would have received an additional $3.9 billion in assets.  Mr. Sheets, in turn, uses that figure as the input for his model to calculate the additional earnout payments Clover would have received under the earnout formula set forth in the APA:  $37,295,081.  These opinions provide an ample basis for a reasonable estimate of Clover's damages.  *See, e.g.*, *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 658-59 (S.D.N.Y. 2012) ("*In re State St. Bank*") (awarding damages after bench trial based on analogous expert testimony).

In its brief in support of its motion ("Br."), Federated does not challenge the qualifications of either Dr. Pomerantz or Mr. Sheets.  Nor does Federated challenge the reliability of Mr. Sheets's opinion.  Instead, Federated concentrates its fire on the reliability of Dr. Pomerantz's asset allocation opinion, contending that the data on which Dr. Pomerantz relies does not support his opinion (Br. at 17-20) and that his methodology is unreliable because his peer group is "fundamentally flawed" (*id.* at 20-21) and because his "math does not work" (*id.* at 21-23).  Federated does not come anywhere near showing that Dr. Pomerantz's analysis has the type of "serious flaws" that would warrant the exclusion of his testimony.  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citation omitted).  At most, Federated's critiques "go to the weight, not the admissibility" of Dr. Pomerantz's testimony.  *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002).

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

*First*, Federated's contention that the data does not support Dr. Pomerantz's "causation" opinion depends on the premise that Dr. Pomerantz is, in fact, *offering* a causation opinion.  That premise is false.  Instead, Dr. Pomerantz's asset allocation opinion is the predicate for a reasonable estimate of *damages* calculated by Mr. Sheets.  The data on which Dr. Pomerantz relies -- all of which was obtained from Morningstar, the gold standard source for such information (*see In re State St. Bank*, at 643 n. 21) -- fully supports *that* opinion.  *See infra*, Argument, Section II(A)(1).

*Second*, Federated's attacks on Dr. Pomerantz's selection of his asset allocation peer group -- which he constructed by, among other things, applying Morningstar mutual fund classifications (*cf.*, *In re State St. Bank*, at 642-43) (identifying peer funds using Morningstar categories) -- are baseless and do not survive scrutiny.  In any event, Dr. Pomerantz's identification and application of the selection criteria for the peer group is a quintessential exercise of professional judgment, challenges to which go to the weight, not the admissibility of an expert's testimony.  *See infra*, Argument, Section II(A)(2)(a).

*Third*, Federated's contention that Dr. Pomerantz's math (who has a Ph.D. in mathematics from the University of California at Berkeley)[5] "does not work" is flat out wrong.  Federated's "hypotheticals" and selective modifications to Dr. Pomerantz's analysis establishes only that Federated either does not understand the math, or, if it does, is manipulating the math in a transparently self-serving manner.  *See infra*, Argument, Section II(A)(2)(b).

Finally, Federated's contention that testimony of Dr. Pomerantz and Mr. Sheets is not relevant is plainly wrong.  *See infra*, Argument, Sections II(B) and III.  Accordingly, Federated's motion to exclude their expert testimony should be denied.

---

[5] Ex. 1 (Expert Report of Steve J. Pomerantz, May 27, 2015 ("Pomerantz Report")) at 3-4.

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

**CLOVER'S EXPERTS**

## I.   DR. POMERANTZ'S OPINIONS

### A.   The Asset Allocation Opinion

Clover Value and Strategic Value "compet[e] in the same space"[6]-- *i.e.*, they compete with each other to manage assets invested in large value mutual funds.  In other words, any investor "looking for a large value product, basically, could invest in the either Clover or Strategic."  Ex. 12 (Pomerantz Tr.)[7] at 70; *see also id.* at 69 ("they're both large value funds, and as such, they compete"); Ex. 13 (Federated marketing executive pushing Strategic Value as a "substitute" for Clover Value).  However, during the earnout period, the "flow of funds into Strategic Value was overwhelmingly larger than the flow [of funds] into Clover [Value]."  Pomerantz Report at 9.  Indeed, Clover Value's net cash flow[8] was *negative* $154 million over the earnout period, whereas Strategic Value's net cash flow over the same period was positive $4.614 *billion*.  *Id.* at 8.[9]  As a predicate for an estimate of damages to be calculated by Mr. Sheets,[10] Dr. Pomerantz "look[ed] at other investment advisors that offered Clover-like and Strategic-like products" during the same time period to answer the question, how did "new money allocate across these two [types of funds in] the large value space?"  Tr. 63-64.

---

[6] *See, e.g.*, Ex. 11 at p. 10 (Clover Value and Strategic Value "competing in the same space").

[7] Because the transcript of Dr. Pomerantz's deposition is cited throughout this brief, it will be cited as "Tr."  Other deposition transcripts will be cited as follows:  "Ex. _ ([LAST NAME] Tr.) at _."

[8] "The net of shares purchased and existing shares redeemed is referred to as 'cash flow.'" Pomerantz Report at 6.

[9] Federated's assertion that it made $364 million in "*gross sales*" for Clover Value during the earnout period (Territ Aff. ¶ 10) is not inconsistent with Dr. Pomerantz's calculation that Clover Value's *net* assets decreased by $154 million.  In other words, Federated ignores *outflows*, which are also impacted by marketing efforts.  *See, infra*, note 52.  Federated's assertion that it sold "$1 billion in gross sales" for all Clover products (Br. at 9) is likewise misleading because it includes $677 million for Clover Small Cap Value (Territ Aff. ¶ 10), which, unlike Clover Value, was not "competing in the same space" with (*i.e.*, cannibalizing assets from) an "in-house" Federated small cap product.  Federated's assertion that it sold "$2 billion in Clover products" (Br. at 1) is not only misleading for all of the foregoing reasons, it is also, at a minimum, inconsistent because Federated *includes* cash flows to "separately managed accounts" -- cash flows that Federated *excludes* from its calculations (*id.* at 11) when it suits its interest.

[10] Pomerantz Report at 5 ("I understand that the formula for calculating the Earnout Payments, and its application in this case, will be the subject of an expert opinion offered by [Mr. Sheets].").

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

Dr. Pomerantz began his analysis by constructing a peer group of mutual fund advisors offering both Clover-like and Strategic-like funds.  Pomerantz Report at 9.  The first step of this process was to identify the most salient characteristics of the Clover Value and Strategic Value funds so that similar funds could be identified.  Clover Value and Strategic Value "are both classified as large value funds by Morningstar" (and by Federated),[11] but they each also have a "secondary classification," which reflects their "management style."  Tr. at 35-36.[12] Specifically, Clover Value has a secondary classification of "growth," and Strategic Value has a secondary classification of "equity income."  Pomerantz Report at 9.  Therefore, Dr. Pomerantz defined a "Clover-like" fund as any large value fund with a secondary classification of growth, and defined a "Strategic-like" fund as any large value fund with a secondary classification of equity income.  Tr. at 88.  Applying these "filters," Dr. Pomerantz identified 13 advisors that -- like Federated -- offered both a Clover-like fund and a Strategic-like fund during the earnout period.  Tr. at 87 (peer group "restricted to advisors that had . . . comparable pairs" of funds); *see also* Tr. at 65 (peer group constructed to ascertain "how new money was allocated at other advisers that similarly offered competing large value products"); *id.* at 53.  Dr. Pomerantz included in his peer group all advisors who offered these "comparable pairs," meaning that he did not "add or subtract" any pairs of funds that met his criteria.  Tr. 85-86; *see also id.* at 87, 88.[13]

Next, Dr. Pomerantz calculated the proportional net cash flow between the Clover-like and Strategic-like funds within each peer group advisor and calculated the average across the

---

[11] "A Large-Cap Value fund is a fund that invests in stocks of companies with a market capitalization value of more than $10 billion."  Pomerantz Report, at 5, n.3.

[12] http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited Sep. 3, 2015); http://www.federatedinvestors.com/FII/mutualfunds/overview.do?product_category=16 (last visited Sep. 3, 2015).

[13] Dr. Pomerantz excluded one fund that was "very, very small" (less than ten million dollars in assets under management among funds managing billions).  Tr. at 86.

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

entire peer group.  Tr. at 78.  Specifically, Dr. Pomerantz calculated that 44% of the net cash

flow within the peer group went to the Clover-like funds, and 56% of the net cash flow in the

peer group went to the Strategic-like funds.  Pomerantz Report at 11.  Dr. Pomerantz opined that

this asset "allocation ratio" is representative of "industry norms."  Tr. at 83; *see also id.* at 78, 80.

Dr. Pomerantz then re-calculated the historical net cash flows to Clover Value and Strategic

Value mutual funds (Pomerantz Report at 11; Tr. at 77-78) and separately managed accounts

(Pomerantz Report at 12; Tr. at 112)[14] to make them consistent with the asset allocation ratio in

the peer group.  Dr. Pomerantz's concluded that, had Federated "raised funds at a rate

commensurate with other funds in the market with a similar management profile and

performance record" (Pomerantz Report at 3), Clover Value would have "received an additional

$3.9 billion in assets" (*id.* at 5; *see also id.* at 11, 12).

### B.    The Performance Opinion

Dr. Pomerantz opines on the "investment performance of various Clover products, as

well as the Strategic Value family of products."  Pomerantz Report at 3.  Dr. Pomerantz analyzed

the performances of Clover Value and Strategic Value compared to the peer groups he

constructed (*id.* at 14-16), as well as their peer groups as defined by Morningstar (*id.* at 16-21).

Dr. Pomerantz concluded that, "[r]elative to both peer groups as well as objective benchmarks,

the investment performance of Clover Value either met or exceeded averages, while Strategic

Value lagged its comparators."  *Id.* at 6.  Thus, Clover Value was "well positioned from a

competitive standpoint, both relative to its peers and to Strategic [Value] as of early 2009."

*Id* at 13; *see also* Ex. 3 ("It has been four years in a row that [Clover Value] has outperformed

---

[14] Although SMAs are not mutual funds, they are "clones" of a specified mutual fund managed for an individual
investor.  *See* Ex. 14 (Thinnes Tr.) at 246; Ex. 15 (Porten Tr.) at 145.  Federated offered SMAs that mirrored the
investment strategies of both Clover Value and Strategic Value.  *See, e.g.*, Ex. 16 (Smith Tr.) at 96; Ex. 17 (Tuskan
Tr.) at 180-81.

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

the benchmark"); Ex. 18 ("the market stinks is not the answer" to the question why Federated

sold more Strategic Value than Clover Value). Dr. Pomerantz's performance opinion is relevant,

among other reasons, to rebut any argument by Federated that the wild divergence in net assets

raised for Clover Value and Strategic Value is attributable to Clover Value's supposedly "poor

performance." Br. at 8.[15]

## C. The Capacity Opinion

Dr. Pomerantz opines that the assets Federated raised for Clover Small Cap Value is "far

below its capacity[16] as measured by the prevailing level of assets under management" among

small cap value funds in the industry. Pomerantz Report at 22. During the earnout period,

Federated attempted to explain its failure to market Clover Value by asserting that its "strategy"

was to "sell out" Clover Small Cap Value first.[17] Dr. Pomerantz's opinion that Federated never

came anywhere near "selling out" Clover Small Cap Value -- coupled with Federated's

admission that, as late as this past spring, Clover Small Cap was *still* only at 75% capacity (Ex.

19 (Heaton Tr. at 125)) -- is relevant to show that Federated's putative "strategy" was plainly

pretextual.[18] Unlike Clover Value, Federated was willing to promote Clover Small Cap Value

---

[15] Federated does not dispute that Dr. Pomerantz's performance opinion is relevant.

[16] "Capacity" is an "industry term" that refers to "how large an asset base [a] fund [can] sustain." Tr. at 47; *see also* Ex. 16 (Smith Tr.) at 29-30 (funds "often times have capacity constraints to as far as how many [] assets they can manage within that strategy").

[17] Ex. 19 (Heaton Tr.) at 103 (as of June 12, 2012, Federated "had not spent a lot of time focusing on the large cap strategy," focusing instead on Clover Small Cap Value).

[18] At a minimum, Federated's "strategy" was grossly negligent or in reckless disregard of the impact on Clover's earnout. *See Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1069 (2d Cir. 1993) (stating the "minimum standard for bad faith should be gross negligence or recklessness"); *see also Pernet v. Peabody Eng'g Corp.*, 20 A.D.2d 781, 782 (1st Dep't 1964) ("reckless or neglectful disregard of plaintiff's contract rights [can] justify an inference of bad faith").

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

because it was not "competing in the same space" with (*i.e.*, cannibalizing assets from) any "in-house" small cap product (Federated had no such product).[19]

## II.   GLENN SHEETS'S OPINION

Mr. Sheets, who is a highly qualified and experienced expert in the calculation of economic damages,[20] constructed a model to calculate the additional earnout payments that Federated would have paid Clover (pursuant to a complex formula set forth in the Asset Purchase Agreement)[21] assuming any specified increase in net assets.  Mr. Sheets reviewed the Pomerantz Report and spoke with Dr. Pomerantz (Ex. 20 (Sheets Tr.) at 13) to satisfy himself that Dr. Pomerantz's "methodology and assumptions" were "reasonable, substantiated by sufficient relevant market information, and appropriate to incorporate into [his] analysis."  Sheets Report at 15; *see also id.* at 8-11 ("I am confident that the math is right; and I am confident that the application that he was attempting to solve is correct.").  Then, using Dr. Pomerantz's $3.9 billion net asset figure as the input for his model, Mr. Sheets calculated that Federated would have paid Clover an additional $37,295,081 in earnout payments.

## ARGUMENT

## I.   THE STANDARD FOR THE ADMISSIBILITY OF EXPERT TESTIMONY

Rule 702 of the Federal Rules of Evidence (each, a "Rule"), as construed by the Supreme Court in *Daubert* and its progeny, governs the admissibility of expert testimony.  Rule 702; *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ("*Daubert*").  Under the Second Circuit's

---

[19] Federated's assertion that its own annual total revenues were falling during the earnout period (Territ ¶ 28) backfires badly as it only underscores that Federated had a powerful motive to squeeze money out of every possible source, including Clover's earnout.

[20] Ex. 2 (Expert Witness Report of Glenn C. Sheets, CPA, CFF, CIRA, CGMA, dated May 27, 2015 ("Sheets Report")) at 4-5.

[21] Federated does not contend that Mr. Sheets misapprehends the earnout formula or that his model does not correctly calculate earnout payments assuming a specified net cash flow.

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

"particularly broad standard for the admissibility of expert testimony," *Colon ex rel. Molina v. BIC USA, Inc.,* 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001) (citing *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir. 1996)), an expert's "analysis need not be perfect to be received in evidence -- it need only rest on a reliable foundation that is relevant to the task at hand," *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 467 (S.D.N.Y. 2014).  Many, if not most, purported concerns and objections "go to the weight, not the admissibility" of expert testimony.  *Amorgianos,* 303 F.3d at 267.  Consequently, the "rejection of expert testimony is the exception rather than the rule."  *IBM Corp. v. BGC Partners, Inc.*, 2013 U.S. Dist. LEXIS, at *17-18 (S.D.N.Y. Apr. 25, 2013) (quoting Rule 702 Adv. Comm. Notes (2000)).

"A court's inquiry into whether an expert meets Rule 702's requirements includes a review of [] whether each proposed opinion is based upon reliable data and reliable methodology [.]" *Roman v. Sprint Nextel Corp.*, 2014 U.S. Dist. LEXIS 138951, at *8 (S.D.N.Y. Sep. 29, 2014).  "[U]nder *Daubert*, the possibility that a different conclusion could be drawn from [the] data [at issue] does not undercut the reliability of the conclusion that was drawn, as long as the expert has "good grounds" for the chosen interpretation." *U.S. v. Morgan*, 53 F. Supp. 3d 732, 741-42 (S.D.N.Y. 2014).  Moreover, "only serious flaws in reasoning or methodology will warrant [the] exclusion" of expert testimony.  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 164, 173.  Conversely, a "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" will not warrant exclusion.  *Amorgianos*, 303 F.3d at 267.  Thus, as a general rule, "alleged weaknesses in the experts' methodologies will go to the weight to be given the expert testimony, not its admissibility."  *Morgan*, 53 F. Supp. 3d at 742 (denying *Daubert* motion); *see also Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 133-34 (2d Cir. 2006) (affirming admission of expert testimony where

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

district court found weaknesses in analysis "went to the weight, rather than admissibility of the testimony").

Similarly, "contentions that [an expert's] assumptions are unfounded go to the weight, not the admissibility, of the testimony." *See 523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 643-44 (S.D.N.Y. 2014) (quotations and citation omitted).[22]  For example, an expert's "selection of comparators" for the purpose of doing a comparative analysis goes to the weight, not the admissibility, of his or her testimony.  *See Washington v. Kellwood Co.*, 2015 U.S. Dist. LEXIS 63457, at *52 (S.D.N.Y. Apr. 21, 2015) ("selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone") (quoting *Celebrity Cruises, Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006)).[23]  Indeed, as the Second Circuit held in a case relied on by Federated (Br. at 14, n. 10), exclusion is warranted only if the expert's assumptions are "so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F. 3d 18, 21 (2d Cir. 1996) (quotations and citations omitted).[24]

"Deference to experts is particularly appropriate when expert testimony concerns 'soft sciences' like economics."[25]  *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 U.S. Dist.

---

[22] *Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.* is not to the contrary.  *Id.*, 910 F. Supp. 2d 629, 648 (S.D.N.Y. 2012) (excluding expert testimony where an essential predicate of the opinion was "contrary to the terms of the agreements" at issue).

[23] To the extent Federated suggests (Br. at 21) that *Celebrity Cruises* is "corroborative of the notion that a utilized yardstick must be 'nearly identical'" to that to which it is compared, the *Kellwood* court expressly rejected that argument.  *Kellwood Co.*, 2015 U.S. Dist. LEXIS 63457, at *51-52.

[24] The facts in *Boucher* illustrate just how "unrealistic" an expert's assumptions must be to warrant the exclusion of his or her testimony.  In *Boucher*, the expert, who calculated lost future earnings, assumed that, but for the accident at issue, the plaintiff would have had full-time, continuous employment for the next 24 years, even though the plaintiff himself testified that his work history prior to the accident "wasn't anything real steady."  *Id.* at 20, 22.  Thus, the expert's assumption represented a "complete break with [the plaintiff's] work history."  *Id.* at 22.

[25] One of Federated's two rebuttal experts (any reference to whom is completely absent from Federated's brief) testified that he views "this case as within the field of social science in that it deals with parts of economics and finance and behavior and organizational behavior."  Ex. 21 (Spencer Tr.) at 56.  *Cf., In re Blech Sec. Litig.,* 2003

10

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

LEXIS 180914, at *117-18 (E.D.N.Y. Oct. 15, 2014) ("*In re Air Cargo*").[26]  Such deference is

appropriate because there is often "no single, established methodology."  *U.S. Info. Sys., Inc. v.*

*Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 228-29

(S.D.N.Y. 2004).[27]  In such cases, an expert's opinion "depends upon judgment and art as well as

the reasoned manipulation of numbers."  *In re Air Cargo*, at *117-18 ("The process is not like a

Pythagorean demonstration of a mathematical truth that can be revealed indisputably. Neither is

it simple 'numbers crunching.") (quotations and citation omitted).

Finally, a court must also evaluate "whether the proposed testimony would be helpful to

the trier of fact."  *Roman*, 2014 U.S. Dist. LEXIS 138951, at *8 (citing Rule 702 (an expert's

testimony must "help the trier of fact to understand the evidence or to determine a fact in

issue")).  The standard is a "liberal one."  *Daubert,* 509 U.S. at 587 (construing relevancy under

Rule 702 in light of Rule 401).  The testimony need only be relevant under Rule 401 -- *i.e.*, have

"any tendency to make the existence of any fact that is of consequence to the determination of

---

U.S. Dist. LEXIS 4650, at *49-54 (S.D.N.Y. Mar. 26, 2003) ("Market behavior is not as objectively ascertainable as reactions in the world of physical science.").

[26] The cases relied on by Federated relating to the admissibility of expert testimony concerning "hard sciences" are factually distinguishable for that reason alone.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 155 (1999) (excluding testimony of engineer); *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 263 (2d Cir. 2002) (excluding testimony of physician and industrial hygienist); *Roman*, 2014 U.S. Dist LEXIS 138951, at *11, *27 (excluding testimony of physician and engineer); *Israel v. Springs Industries, Inc.*, 2006 U.S. Dist. Lexis 80863, at *11, *34  (E.D.N.Y. Nov. 3, 2006) (excluding testimony of physician and psychologist); *Kozar v. Sharp Electronics Corp.*, 2005 U.S. Dist. Lexis 49384, at*5-9 (W.D. Pa. Sep. 30, 2005) (excluding testimony of engineer and fire origination investigator).

[27] The "regression analysis" case relied on by Federated, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 U.S. Dist. LEXIS 16034, *15-18 (S.D.N.Y. Feb. 10, 2015), is distinguishable because specific standards for the admissibility of a regression analysis (a statistical technique designed to isolate a causal variable) have emerged in the case law, and inapposite because Dr. Pomerantz did not do a regression analysis (Tr. at 70).  *Cf. EEOC v. Venator Grp.*, 2002 U.S. Dist. LEXIS 1724, at *6 (S.D.N.Y. Feb. 5, 2002) (regression analysis is "not a prerequisite for the admission of statistical reports").

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

the action more probable or less probable than it would be without the evidence." *Amorgianos,*

303 F.3d at 265 (citing Rule 401).[28]

## II.   DR. POMERANTZ'S OPINIONS ARE ADMISSIBLE

### A.   Dr. Pomerantz's Asset Allocation Opinion Is Reliable

Dr. Pomerantz's methodology in formulating his asset allocation opinion[29] was, in

summary, to (i) construct a peer group of advisors that, like Federated, offered Clover-like and

Strategic-like funds that were competing in the same space in the same time-period (Tr. at 178),

(ii) calculate how the net cash flow split between the Clover-like funds and Strategic-like funds

at those advisors (*id.* at 135),[30] and (iii) calculate the net increase in assets Clover Value would

have experienced had the asset allocation at Federated between Clover Value and Strategic

Value been commensurate with the experience of the peer group (*id.* at 186-189).  Dr. Pomerantz

testified that, although it may be a "different metric of interest" in any given circumstance, such

a "comparison to an industry norm [] is a pretty standard thing to do."  Tr. at 84.[31]

*In re State St. Bank* is illustrative.  In that case, the plaintiff offered mutual funds to

institutional investors, the defendant managed two of those mutual funds imprudently, the

investors suffered losses, and the plaintiffs asserted ERISA claims on their behalf.  *Id.* at 616.  At

---

[28] "A court's inquiry into whether an expert meets Rule 702's requirements [also] includes a review of [] the qualifications of the proposed expert [.]" *Roman*, 2014 U.S. Dist. LEXIS 138951, at *8.  Here, Federated does not argue that either Dr. Pomerantz or Mr. Sheets are not qualified to render their respective opinions.

[29] Federated does not challenge the reliability of Dr. Pomerantz's performance opinion.

[30] As Dr. Pomerantz testified, "[p]eople calculate cash flows, net cash flow, all the time."  Tr. at 82-83; *see also* Tr. at 66 ("cash flow" analysis is "pretty ubiquitous").  Indeed, Federated points to comparative cash flows in support of its motion.  *See* Br. at 8 ("risk aversion was demonstrated in mutual fund flows").  This is not a "novel" methodology, as Federated contends (Br. at 20, n.12); it is a "slight modification [to] an otherwise reliable method." *Amorgianos*, 303 F.3d at 267.

[31] Dr. Pomerantz did not "admit," as Federated asserts (Br. at 1; *see also id.* at 11), that his analysis is "novel, untested, unreliable [or] contradicted by [his] own data and observations."  Rather, Dr. Pomerantz acknowledged that he is not aware of a comparative cash flow analysis being used "in this particular application," (Tr. at 84), which is not surprising given that the "niche" question he addressed is not of "general interest to investors" (*id.* at 194-95).

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

trial, the plaintiff's expert "presented evidence of the [] losses by comparing what [investors] earned" in the funds at issue "with what they would have earned if [their] entire investments in the [funds] had been invested in a prudently managed alternative [funds] during [the relevant] time." *Id.* at 642.[32]  The expert identified the peer funds by "search[ing] for mutual funds that Morningstar had categorized" the same as the funds at issue and that "used the same benchmarks as the [funds] at issue."  *Id.* at 642-43.  "Based on the performance of the [funds at issue] in comparison to [the peer funds]," the plaintiff's expert calculated the investor's losses.  *Id.* at 643.  The Court held that the peer funds selected by the plaintiff's expert "provide[d] reasonable proxies[33] for determining how [the funds at issue] might have been managed absent [the defendant's] breaches" and awarded damages on that basis.  *Id.* at 659.[34]  So too here, Dr. Pomerantz identified and analyzed peer funds in support of a damages calculation.

Dr. Pomerantz's asset allocation opinion "depends upon [the application of] judgment and art as well as the reasoned manipulation of numbers," *In re Air Cargo*, 2014 U.S. Dist. LEXIS, at *117-18, to conduct an analysis for which there is "no single, established methodology," *U.S. Info. Sys., Inc.*, 313 F. Supp. at 228-29.  As such, deference is "particularly appropriate."  *In re Air Cargo*, 2014 U.S. Dist. LEXIS, at *117-18.  As shown below, Federated may not agree with Dr. Pomerantz's selection of a peer group, or his use of cash flow analysis to calculate the additional net cash flow Clover Value would have experienced had Federated raised

---

[32] In *In re State St. Bank*, the damages expert did not opine on causation.  Rather, the court found, separately, that the plaintiff had satisfied the traditional standard for proximate causation based on the facts.  *In re State St. Bank,* 842 F. Supp. 2d at 654.

[33] *Beastie Boys v. Monster Energy Co.* is readily distinguishable because in that case, unlike this case or *In re State St. Bank*, the expert acknowledged that she was "ignorant" of the relevant characteristics of the putative "proxy." *Id.*, 983 F. Supp. 2d 369, 374 (S.D.N.Y. 2014).

[34] Although the Court specifically addressed the "proper manner in which to calculate damages pursuant to ERISA," *In re State St. Bank,* 842 F. Supp. 2d at 655, the standard is not different in any meaningful way, especially, as the district court noted, "in light of the Second Circuit's admonition that "uncertainties in fixing damages will be resolved against the wrongdoer."  *Id.* at 659 (citation omitted).

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

assets for Clover Value commensurate with its peer group, but his judgments, assumptions and methodology are well within the "range where experts might reasonably differ, and [therefore] the jury must decide among the conflicting views of different experts [.]"  *Concord Camera Corp. v. Fuji Photo Film Co.*, 2000 U.S. Dist. LEXIS 10338, at *38-39 (S.D.N.Y. July 24, 2000) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).  Accordingly, Federated's *Daubert* motion should be denied.

### 1.    <u>Dr. Pomerantz's Opinions Are Based Upon Reliable Data</u>

Federated does not, because it cannot, argue that Dr. Pomerantz's opinions are not "based upon reliable data."  *Roman*, 2014 U.S. Dist. LEXIS 138951, at *8.  As Dr. Pomerantz testified, the "primary source" of data he used to render his opinions was Morningstar Principia, which is a "third-party data provider [and] research provider for mutual fund products."  Tr. at 21-23. Morningstar Principia is recognized as a "standard data source" in the mutual fund industry.  *In re State St. Bank*, at 643, n.21.  Instead, Federated argues that the "data does not support [Dr. Pomerantz's] conclusion."  Br. at 17-20.  As shown below, Federated's arguments are baseless.

*First*, Federated points out that Dr. Pomerantz concludes that, had Federated "raised funds at a rate commensurate" with the allocation peer group, Clover Value's net cash flow would have been "significantly reduced -- not increased" in 2013.  Federated claims that this "defies all common sense," if Dr. Pomerantz's conclusion is that better marketing would have caused these precise cash flows.  Br. at 18.  But Dr. Pomerantz is not offering a causation opinion.  *See* Br. at 17-18.[35]  Dr. Pomerantz's opinion is that, had Federated "raised funds at a rate commensurate" with its peers, Clover Value would have "received an additional $3.9 billion in assets."  Pomerantz Report at 3, 5; *see also* 11, 12.  That opinion, together with Mr. Sheets's

---

[35] This erroneous premise permeates Federated's brief.  *See, e.g.*, Br. at 2 (Dr. Pomerantz performs "no causal analysis"); *id.* at 3 (Dr. Pomerantz offers an "unsupported causal opinion"); *id.* at 10, 15, 16, 17, 21, 22.

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

opinion, will provide the jury a reasonable basis for an estimate of damages.  *Cf. In re State St.*

*Bank & Trust,* 842 F. Supp. 2d at 658 (finding analogous "calculation of damages [was]

appropriate").  Whether Federated's acts and omission were a proximate cause of those damages

is a separate question of fact for the jury.[36]  Once it is understood that Federated is attacking a

proverbial "straw man," Federated's argument collapses.[37]  That Dr. Pomerantz calculated an

increase in outflows in 2013[38] is in no way contrary to Dr. Pomerantz's conclusion that Clover

Value's modified cash flow would have been $3.9 billion more *over the entire earnout period*,

which is the relevant period for purposes of calculating the ultimate total earnout payments.[39]

*Second*, Federated asserts that "the new money actually raised by [Federated for Clover

Value] was smack in the middle of [Dr. Pomerantz's] peer group."  Br. at 19.  "[S]mack in the

middle" is, of course, not a term of art, and Federated's loose language obfuscates the substance

of its argument -- *i.e.*, that the *median* is, according to Federated, a more appropriate yardstick

than the *average*, which is what Dr. Pomerantz calculated.[40]  While the chart proffered by

---

[36] Causation "involve[s] the kinds of judgmental variables which have traditionally, and soundly, been left to the finders of fact to resolve even where the facts are essentially undisputed."  *Raider v. Friedman*, 162 A.D.2d 112, 556 (1st Dep't 1990).

[37] There is no "analytical gap" (Br. at 18) between the data or methodology and Dr. Pomerantz's *actual* opinion.  Br. at 18 (quoting without citing *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005) (precluding expert's "personal view of the officers' credibility [premised on nothing more than his] *instinct* that the officers were not lying") (emphasis supplied)).

[38] In 2013, both Strategic Value and Clover value had a net loss of assets, but Strategic Value lost significantly more.  Pomerantz Report at 12.  Applying the allocation ratio consistently results in adjusting Clover Value's net cash flow in 2013 from negative $107 million to negative $214 million.  Federated's complaints about this are beyond ironic, as Dr. Pomerantz's consistency both "redound[s] to [Federated's] benefit" modified cash flow and reflects his "due care, and an attempt to tabulate damages as accurately as possible[.]"  *Hart*, 60 F. Supp. 3d at 466-67.

[39] As Mr. Sheets explained, "[b]ased on the structure of the contingent payment calculation, in the event the growth in revenue was lower than required for a payment to be made in a given period, [[t]he APA] allowed for a "claw-back" of the contingent payments in subsequent periods. This allowed Clover to potentially earn a larger contingent payment in a given year in order to regain unrecognized payments from previous years. The provision did not require repayment of any portion of payments previously received if the CAGR in future periods was lower. This eliminated the possibility of negative contingent payments."  Sheets Report at 10.

[40] An average, or arithmetic mean, is the sum of the values divided the number of values added.  By comparison, the median cuts the values in half:  half of the values are larger than the median, and half are smaller.  *See Black's Law*

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

Federated (Tambe Ex. F) depicts the approximate median (six values are above Clover Value,

and seven values are below), Federated's chart disguises what the average reveals:  the increase

in assets in the six funds above Clover Value was *significantly larger* than the decrease in assets

in the seven funds below Clover Value:[41]



Pomerantz Aff. ¶ 8.[42]  As one of Federated's rebuttal experts acknowledged, averages, not

medians, are the standard benchmark of performance in the financial industry.  Ex. 15 (Porten

Tr.) at 114; *see also* Ex. 21 (Spencer Tr.) at 185-86 (a benchmark is "a comparison of an *average*

performance of an established population against an individual member of the population")

(emphasis supplied).While it is in theory possible -- for some reason that Federated has not

articulated -- that the "median is a better tool for measuring damages under the circumstances

presented, that possibility, by itself, is not a basis for excluding [Dr. Pomerantz's] testimony."

*Khadera*, 2011 2011 U.S. Dist. LEXIS 149021, at *17-18. [43]

---

*Dictionary* (10th ed. 2014) (definitions of average and median); *see also Khadera v. ABM Indus. Inc.*, 2011 U.S. Dist. LEXIS 149021, at *16, n. 3 (W.D. Wash. Dec. 28, 2011) (discussing the difference between an average and a median).

[41] This chart actually understates the disparity as it omits SMAs and is not scaled to account for initial assets.

[42] "Pomerantz Aff." refers to the accompanying affidavit of Dr. Pomerantz, sworn to on September 3, 2015.  An expert affidavit is "properly submitted" in opposition to a *Daubert* motion if it is "within the scope of the initial expert report."  *Kellwood*, 2015 U.S. Dist. LEXIS 63457, at *41-42.

[43] Federated contends that Dr. Pomerantz's "average number is meaningless" because, as Dr. Pomerantz testified, he does not expect any funds to "look like" the average.  Br. at 18.  Dr. Pomerantz "admitted" no such thing.  To the contrary, Dr. Pomerantz testified that, in his opinion the average is "representative of the industry."  Tr. at 78.  In the snippet of testimony Federated takes out of context, Dr. Pomerantz was making the mathematical point he expressly articulated later -- *i.e.*, that "*by the nature of being an average*, there will be numbers higher, and there will be

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

*Third*, Federated identifies the pair of funds in the asset allocation peer group with the largest net increase in assets for the Clover-like fund (the Fidelity Funds), "deletes" them from the peer group, re-calculates the asset allocation ratio, and asserts that doing so "*reverses*" Dr. Pomerantz's results.  Br. at 19 (emphasis in original).[44]  But Federated's manipulation of Dr. Pomerantz's analysis through the self-serving omission of a pair of peer funds that indisputably meet Dr. Pomerantz's stated selection criteria establishes nothing.  If such cherry-picking were appropriate -- and it is not -- Clover could have concocted some pretext to exclude the pair of funds with the largest net increase in assets for the Strategic-like fund (the Black Rock funds) and "deleted" them from the asset allocation peer group, which would have *doubled* the average net assets raised for Clover-like funds.  Pomerantz Aff. ¶ 9.  Instead, as discussed in the next section, Dr. Pomerantz specified the peer group selection criteria and applied those criteria consistently, resulting in the inclusion of *both* the Fidelity Fund and Black Rock. Tr. at 85, 87-88.  Such consistent application of objective criteria is indicative reliability.

## 2.      Dr. Pomerantz's Opinions Are Based Upon A Reliable Methodology

As shown below, "[i]his is not a case in which [Dr. Pomerantz] is unable to articulate a rationale for his methodology; nor is it a case where the proffered rationale is patently flawed or unreasonable."  *In re Vitamin C Antitrust Litig.*, 2012 U.S. Dist. LEXIS 181158, at *31 (E.D.N.Y. Dec. 20, 2012).  Therefore, "[i]t is for the jury to determine whether the

---

numbers lower."  Tr. at 80 (emphasis supplied).  Federated's rebuttal expert, Professor Spencer, made the same point:  "it's hard to find *anything* that looks just like the average."  Ex. 21 (Spencer Tr.) at 85 (emphasis supplied). To take an example from baseball, a batter with a batting average of .333 will never, in fact, hit 3 1/3 hits in one game.  That does not render batting averages "meaningless."

[44] Federated's explanation for its removal of the least favorable funds (from its perspective) from the allocation peer group is that the Clover-like Fidelity Fund supposedly is "nothing like Clover Value" because it is "closed to the Clover-like investing public."  *Id.*  In Dr. Pomerantz's opinion, however, that is a distinction without a difference. Tr. at 58-59.  The Fidelity Fund is not closed to *all* investors, just to *retail* investors.  *Id.*  In any event, Federated does not and cannot contend that the Fidelity Funds do not meet Dr. Pomerantz's stated selection criteria.  They do.

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

methodological decisions that [Dr. Pomerantz] made render his analysis either more or less persuasive[.]" *Id.* at 32.[45]

### a.   Dr. Pomerantz's Method Of Selecting Peer Groups Is Reliable

Federated contends that Dr. Pomerantz's "peer groups" are "fundamentally flawed." Br. at 20.  That contention is baseless.  Dr. Pomerantz constructed his peer groups using Morningstar categories, which is a reliable way to do so.  *See, e.g., In re State St. Bank*, 842 F. Supp. 2d at 642-643 (finding calculation of damages appropriate where expert selected peer funds using Morningstar categories).  In any event, Federated's critique of Dr. Pomerantz's "selection of comparators" goes to the weight, not the admissibility, of his opinion.  *Kellwood Co.*, 2015 U.S. Dist. LEXIS 63457, at *52-54.

*First*, Federated asserts that Dr. Pomerantz's analysis uses two different peer groups for his cash flow analysis and his performance analysis "without justification." Br. at 20.  But there is no requirement that an analyst use the same peer group to analyze different things.  Dr. Pomerantz constructed one peer group to measure the allocation of new assets between Clover-like and Strategic-like funds at other advisors offering both types of funds during the earnout period, and a second peer group to analyze the investment performance of Strategic Value relative to its "competitors." Pomerantz Report at 9; Tr. at 40.  As Dr. Pomerantz explained:

> I have two different peer groups.  The first is a peer group for
> purposes of performance . . . and the other peer group is driven by
> different criteria, namely that the advisor offered two different
> value products that compete with Clover and Strategic.  So you are
> going to get different peer groups.

---

[45] For this reason alone, *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.* is readily distinguishable. *Id.*, 2008 U.S. Dist. LEXIS 44216, *15 (S.D.N.Y. 2008) (purported "valuation" expert did not follow "*any* valuation method" at all) (emphasis supplied).

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

Tr. at 178-79.[46]  That is Dr. Pomerantz's "justification," and it is perfectly reasonable.

*Second*, Federated asserts, without explanation, that Dr. Pomerantz "defined his groups inconsistently."  Br. at 20.  That is simply incorrect.  As Dr. Pomerantz explained at his deposition, he "locked [himself] into a methodology" by selecting the criteria for the peer groups.  In other words, Dr. Pomerantz did not "add or subtract" any funds from the peer groups that met his selection criteria.  Tr. at 85-86.  Federated does not and cannot show that any of the funds in the peer group do *not* meet Dr. Pomerantz's stated selection criteria (except one he excluded as too small by orders of magnitude).  Moreover, Federated did not identify any funds that it claims *do* meet Dr. Pomerantz's stated selection criteria but are not in the peer group, and Dr. Pomerantz is not aware of any.  Tr. at 88.

*Third*, Federated asserts that Dr. Pomerantz "did not account for whether any of the peer funds grew through mergers or acquisitions."  Br. at 20.  Federated assumes that whether the "funds grew through mergers or acquisitions," as opposed to direct investment, is a meaningful distinction.  In Dr. Pomerantz's opinion, it is not.  As Dr. Pomerantz testified, "[i]f a fund grew because it acquired assets from another mutual fund that was in a different category, that would be new cash flow to me."  Tr. at 50; *see also id.* 50-53, 144.[47]  That is because investors are free to withdraw their money from a fund, and an investor's decision *not* to do so after a merger or acquisition reflects "investor sentiment."  Tr. at 55-56.  In other words, marketing affects

---

[46] To construct the Strategic Value performance peer group, Dr. Pomerantz applied the allocation peer group filters (a large value fund with a secondary classification of equity income) and "further refined" the peer group by requiring that the fund had a dividend yield over 3% and offered Class A shares.  As Dr. Pomerantz explained, he did so in order to identify close "competitors" of Strategic Value.  Tr. at 37-40; *see also* Pomerantz Report at 18.  This refinement changed the peer group's performance two-tenths of one percent.

[47] Dr. Pomerantz's exclusion of assets merged into Clover Value in calculating new cash flows into that fund is not inconsistent because those assets *did not count* for the purpose of calculating the earnout payments.  *See* Sheets Report at 9-10.

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

*outflows* as well as *inflows*.[48]  Therefore, Dr. Pomerantz concluded that it would not "affect [his]

analysis if [a fund's growth] was because of a merger."  Tr. at 151; *see also id.* at 143-53.[49]

    *Fourth*, Federated asserts that Dr. Pomerantz "did not control for the fact that some of his

'peer' funds are sold on different terms than the Clover funds."  Br. at 20.  Again, Federated's

assumes that the "different terms" it identifies are meaningful.  Again, in Dr. Pomerantz's

opinion, they are not.  Tr. at 54-59.  For example, as Dr. Pomerantz testified, the "changes in

assets [in the allocation] peer group reflect investor sentiment," even if some funds are only

available to institutional investors, and not the "general investing public," because it "reflects

what real investors are doing with their money."  Tr. at 54-55.  In other words, the average

allocation of new money in the peer group reflects the "aggregate of investor decision[s]" (Tr. at

57), whether those investors are institutional investors or members of the "general investing

public."  Federated asserts that Dr. Pomerantz did not account for "other variables" as well (Br. at

22, n.14), but there is no requirement that an expert include all "measurable variables" in his or

her analysis.  *EEOC v. Venator Grp.*, 2002 U.S. Dist. LEXIS 1724, at *6, n. 1 (S.D.N.Y. Feb. 5,

2002) (citation omitted).

      **b.**    **Federated's Other Challenges to the Reliability
of Dr. Pomerantz's Methodology Have No Merit**

    Federated asserts a handful of other challenges to the reliability of Dr. Pomerantz's

methodology.  Br. at 21.  As shown below, Federated does not come anywhere near identifying a

"serious flaw[]" in his methodology.  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 173.

---

[48] Indeed, one of Federated's rebuttal experts, Charles Porten, relied on an article reporting this very phenomenon. Ex. 15 (Porten Tr.) at 94-95; *id.* Ex. 22 (marketing "moves have helped persuade some investors to stay"); *see also* Ex. 23 (Clover employee stating Federated needs to conduct "campaign to protect our back door" from "outflows from the [Clover] Value Fund").

[49] Although incomplete information concerning mergers and acquisitions among the funds in the allocation peer group was available, Dr. Pomerantz did not include that incomplete information to ensure that his comparison was "apples to apples" (Tr. at 53), not "apples to oranges" (*Boucher*, 73 F.3d at 21).

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

*First*, Federated contends that Dr. Pomerantz is "not actually measuring what he claims to measure." Br. at 21. Specifically, Federated contends that Dr. Pomerantz errs by looking at "net" cash flow without distinguishing between inflows and outflows. Federated is wrong. As demonstrated by the testimony Federated cites, Dr. Pomerantz was crystal clear that he was "measuring" net cash flow. *Id.* As Dr. Pomerantz explained, because he could not get complete information on the inflows and outflows, but could get complete information on net flows Dr. Pomerantz used net cash flows in order to hold his "methodology constant across all mutual funds." Tr. at 76. This was no surprise to Mr. Sheets. As Mr. Sheets testified, he conferred with Dr. Pomerantz "to ensure that the data that [he] was receiving was going to be properly applied within [his earnout] calculations." Ex. 20 (Sheets Tr.) at 14-15. As a result, he constructed his model such that "net flows was . . . the significant factor to drive the calculation" of additional earnout payments in his model. *Id.* at 20-21. Federated might not agree with Dr. Pomerantz and Mr. Sheets's (correct) "judgments as to the appropriate variable to plug into [the earnout] calculation," but that does not render either of their opinions inadmissible. *In re Vitamin C Antitrust Litig.*, 2012 U.S. Dist. LEXIS 181158, at *20-21.

*Second*, Federated contends that Dr. Pomerantz's method is unreliable because "even minor changes in the outflows substantially alter his calculations." Br. at 22. Specifically, Federated creates two hypothetical scenarios, which it claims show that, "if there were an 8% drop in redemptions to the Strategic Value peer group (26 to 24) the average allocation for Clover's peer group would change by over 40%." *Id.*; *see also id.* Tab B. Federated's hypotheticals show no such thing. As Dr. Pomerantz attests, Federated fundamentally misapprehends Dr. Pomerantz's mathematical calculations and, therefore, the significance of its own hypotheticals. Pomerantz Aff. ¶¶ 2-6. Correctly understood and properly calculated,

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

Federated does not make a "*minor* change[]" to its hypothetical, as it contends.  Br. at 22 (emphasis supplied).  To the contrary, the change between Federated's first and second hypothetical is both "significant" and renders Federated's two hypotheticals "qualitatively" different (*id.* ¶ 4) and generates the "mathematically expected result" (*id.* ¶ 5).

*Third*, Federated contends that Dr. Pomerantz errs by calculating his asset allocation ratio on an "*aggregate* basis," as opposed to year-by-year.  Br. at 23 (emphasis in the original).  Federated further contends that recalculating Dr. Pomerantz's asset allocation ratio on a "year-by-year" basis "destroys his analysis completely."  *Id.*  Not so.  Because of the "claw back" feature of the earnout formula, which Federated completely ignores, calculating cash flows on an "aggregate basis" is the appropriate method.  Pomerantz Aff. ¶ 7 [50]  Yet, even in Federated's attempted recalculation of Dr. Pomerantz's asset allocation ratio (Br., Tab D), "Federated calculates each year separately *without regard to any of the prior years*."  Pomerantz Aff. ¶ 7 (emphasis in original).  In other words, Federated *still* ignores the claw-back provision.  As a result, to borrow a phrase, Federated's "math does not work" (Br. at 21) and, therefore, establishes nothing.[51]

## B.     DR. POMERANTZ'S OPINIONS ARE RELEVANT

Dr. Pomerantz's asset allocation opinion is relevant to a calculation of damages.[52]  It is well-settled that, "if a plaintiff has shown it more likely than not that it has suffered damages, the

---

[50] This is the "meaningful explanation" Federated claims is absent.  Br. at 23 (*quoting Lippe v. Bairnco Corp.*, 99 Fed. Appx. 274, 279 (2d Cir. 2004)).  *See* Sheets Report at 10 (quoted *supra* in note 39 ).

[51] Federated's contention that Dr. Pomerantz's capacity opinion is "unsupported speculation" (Br. at 24) has no merit.  This straightforward, non-controversial opinion is grounded in a survey of other small cap funds.  Pomerantz Report at 21-22.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) is readily distinguishable because, in that case, the court precluded as "conclusory" the testimony of a rebuttal expert who cited no evidence, offered no analysis of the affirmative expert's theory, conducted no "empirical studies" of his own, and proposed to testify only that he "disagreed."

[52] *Raskin v. Wyatt Co.* is distinguishable for this reason alone because, in that case, the court found that the expert testimony at issue was not "relate[d] to any issue in the case."  *Id.*, 125 F. 3d 55 (2d Cir. 1996).

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

amount of damages need only be proved with reasonable certainty." *Boyce*, 464 F.3d at 391-92.

Moreover, where "the existence of damage is certain, and the only uncertainty is as to its

amount, [] the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Id.* at

391.[53]  And, of course, "[e]vidence need not be conclusive in order to be relevant." *Id.*  Here,

Clover will ask the jury to conclude that a good faith effort by Federated to promote Clover

Value would have raised net assets commensurate with its peers (even though far less would

have achieved the maximum earnout).  On that basis, the jury can (and Mr. Sheets did) calculate

Clover's damages *to the dollar*.[54]

Dr. Pomerantz's asset allocation opinion is also relevant to rebut alternative explanations

posited by Federated for its failure to raise more assets for Clover Value.[55]  Federated has

argued, and suggests in its motion, that "market conditions," not its own misconduct, explain the

enormous differential in net assets raised for Clover Value and Strategic Value.  *See* Br.,

Introduction, Section I.D.  By narrowing the focus from the entire category of large value funds

to 13 pairs of funds offered by financial advisors who, like Federated, offered Clover-like and

Strategic-like funds competing in the same space, in the same time-period, and in the same

market conditions, Dr. Pomerantz's asset allocation analysis has the "advantageous feature of

'controlling' in a rough way for market factors," which affect all "comparators alike."  *Celebrity*

---

[53] The so-called wrongdoer rule may not save a damages opinion from preclusion under Rule 702 where, "[i]nstead of applying a discernable methodology to the data before him, [the expert] appears to rely on his instinct," *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 576 (S.D.N.Y. 2007), but hat is not the case here.  In any event, Clover articulates the standards under New York law for the estimation of damages, not to show that Dr. Pomerantz's testimony is *reliable*, but to show that it is *relevant*.

[54] It is not "convenient" (Br. at 2) that Mr. Sheets calculated the maximum earnout amount; it is the properly calculated amount because the net assets Federated should have raised for Clover Value *far exceeds* the amount required to achieve the maximum earnout.

[55] Although Dr. Pomerantz did not opine on "whether Federated's marketing efforts actually *caused* any decreased flows into Clover products" (Br. at 17 (emphasis in original)), it simply does not follow that his opinion (which has a "tendency" to make an *alternative* cause posited by Federated "less probable") is not relevant.  The jury, of course is "free to draw [its] own conclusion" from an expert's testimony, even if the conclusion is not that of the expert. *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 725 F.3d 65, 113-15 (2d Cir. 2013).

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

*Cruises*, 434 F. Supp. 2d at 180; *see also id*. at 188 (use of comparators "acted as a rough control for factors other than" the events at issue).[56]  While the large cap value category as a whole may have had "significant net outflows," the subset of Clover Value's peer funds had significant net inflows, which has a "tendency" to make Federated's broad-stroke, market-based excuses for its misconduct, at a minimum, "less probable."  *Amorgianos,* 303 F.3d at 265.

## III.   <u>MR. SHEETS'S TESTIMONY IS ADMISSIBLE</u>

Mr. Sheets's damages model and his related testimony satisfy all the tests of admissibility.  First, Mr. Sheets is unquestionably qualified to testify as a damages expert.  *Serv. Source v. Office Depot, Inc.*, 2005 U.S. Dist. LEXIS 47948, at *10-11 (E.D. Mich. Nov. 28, 2005) (finding that "Mr. Sheets … [has] sufficient knowledge, skill, experience, training and education" to testify as a damages expert).  Second, Mr. Sheets carefully constructed his model and confirmed its reliability by testing it against historical results.  (Ex. 2 (Sheets Report) ¶ 39).[57] In any event, Federated does not even argue that Mr. Sheets's model is not reliable.  Third, Mr. Sheets's damages model and his related testimony will no doubt be "helpful to the trier of fact." *Roman*, 2014 U.S. Dist. LEXIS 138951, at *8.  *Cf. Louis Vuitton Malletier S.A. v. Sunny Merch.*

---

[56] New York law does not require Clover to "prove that [Federated's] conduct was the sole cause of the injuries." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp*., LLC, 513 Fed. Appx. 30, 32-33 (2d Cir. 2013).  Rather, where the breach is "one cause among many," all that is required is that the breach was a "substantial factor in bringing about the harm."  *Coastal Power Int'l v. Transcon. Capital Corp*., 10 F. Supp. 2d 345, 367 (S.D.N.Y. 1998) ("although obviously not the *sole cause* of the modifications, [the breach] operated to an important extent in producing the harmful result") (emphasis supplied); *see also Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.,* 2010 U.S. Dist. LEXIS 114440, at *9-10 (S.D.N.Y. Oct. 13, 2010) (rejecting argument that "causation cannot be established because any damages were *also* proximately caused by the current economic and real estate climate, the failure of [plaintiff's] business, and [plaintiff's] voluntary filing for Chapter 11 relief") (emphasis supplied).

[57] Federated's repeated assertion that Pomerantz's methodology is "untested" (Br. at 1, 2, 10, 11, 20) is predicated on a misapprehension of Rule 702.  "As explained in the Advisory Committee Notes to amended Rule 702, the *Daubert* factor relating to 'whether the expert's technique or theory can be tested' means 'whether the expert's theory can be challenged in some objective sense, or whether it instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'"  *Lesser ex rel. Lesser v. Camp Wildwood*, 282 F. Supp. 2d 139, 144 (S.D.N.Y. 2003).  As the efforts of Federated's rebuttal experts to do so demonstrate, Dr. Pomerantz's methodology is "*capable* of being tested."  *Lidle v. Cirrus Design Corp*., 2010 U.S. Dist. LEXIS 67031, at *16-18 (S.D.N.Y. July 6, 2010) (emphasis supplied, quotations and citation omitted).  That is all that is required.

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

*Corp.*, 2015 U.S. Dist. LEXIS 42630, at \*39-40 (S.D.N.Y. Mar. 31, 2015) (excel spreadsheets prepared by expert to calculate "revenues, cost margins, and profits" admissible because, among other reasons, they "will streamline the presentation of that data to the jury"). Federated's challenge to the admissibility of Mr. Sheets's model and his related testimony is entirely collateral -- *i.e.*, Federated argues only that Mr. Sheets's testimony should be excluded to the extent that Dr. Pomerantz's allocation opinion is excluded. Br. at 25. Because Dr. Pomerantz's is admissible, Mr. Sheets's testimony is admissible as well.[58]

## CONCLUSION

Accordingly, Clover respectfully submits that the Court should deny Federated's *Daubert* motion, hold that Dr. Pomerantz's allocation, performance and capacity opinions are admissible, hold that Mr. Sheets's damages model and his related testimony are admissible, and award such other and further relief as is just and proper.

---

[58] Even assuming that Dr. Pomerantz's allocation opinion were inadmissible, only "those aspects of [Mr. Sheets's] calculation that rely on" that opinion would be subject to collateral attack. *Fed. Hous. Fin. Agency*, 2015 U.S. Dist. LEXIS 16034, at \*36. Mr. Sheets did not rely on Dr. Pomerantz to construct his model (Ex. 20 (Sheets Tr.) at 34), but only for the net cash flow input. If necessary, Clover could provide Mr. Sheets with an alternative (*i.e.*, non-expert) evidentiary basis for a net cash flow input for his model.

CONFIDENTIAL PURUSANT
TO PROTECTIVE ORDER

Dated:  New York, New York
September 4, 2015

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: ____/s/ Trevor J. Welch_____
Mark P. Ressler (mressler@kasowitz.com)
Trevor J. Welch (twelch@kasowitz.com)
James E. D'Elicio (jdelicio@kasowitz.com)
Kalitamara L. Moody (kmoody@kasowitz.com)
Melissa Barahona (mbarahona@kasowitz.com)
1633 Broadway
New York, New York 10019
(212) 506-1700
(212) 506-1800 (fax)

*Attorneys for Plaintiff CCM Rochester, Inc.*