**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CCM ROCHESTER, INC., f/k/a/ CLOVER CAPITAL MANAGEMENT, INC., | |
| PLAINTIFF, | Case No. 14-cv-3600 (VEC) |
| v. | |
| FEDERATED INVESTORS, INC., | |
| DEFENDANT. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF FEDERATED INVESTORS, INC.'S MOTION TO EXCLUDE CERTAIN OPINIONS PROFFERED BY PLAINTIFF**

JONES DAY
Jayant W. Tambe
Tracy V. Schaffer
222 East 41st Street
New York, New York  10017
(212) 326-3939

JONES DAY
Jeffrey D. Baltruzak
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania  15219-2514
(412) 391-3939

*Attorneys for Defendant*
*Federated Investors, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

    I.     CCM MISSTATES THE APPLICABLE LEGAL STANDARD ........................ 2

    II.    THE OPINIONS OF DR. POMERANTZ SHOULD BE EXCLUDED .............. 4

         A.     Dr. Pomerantz's Opinions Are Inadmissible For Damages ..................... 4

         B.     CCM Offers No Justification for Dr. Pomerantz's SMA
             Conclusion ............................................................................................ 9

         C.     Dr. Pomerantz's Small Cap "Capacity" Opinion Should Not Be
             Admitted ................................................................................................ 9

    III.   THE OPINIONS OF MR. SHEETS SHOULD BE EXCLUDED ..................... 10

CONCLUSION .................................................................................................................. 10

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Celebrity Cruises, Inc. v. Essef Corp.*,
   434 F. Supp. 2d 169 (S.D.N.Y. 2006) ................................................................7, 8

*EEOC v. Bloomberg L.P.*,
   2010 U.S. Dist. LEXIS 92511 (S.D.N.Y. Aug. 31, 2010) ......................................3

*Faiveley Transp. USA, Inc. v. Wabtec Corp.*,
   511 F. App'x 54 (2d Cir. 2013) ...........................................................................6, 7

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2014 U.S. Dist. LEXIS 180914 (E.D.N.Y. Oct. 15, 2014) ...................................2, 4

*In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
   842 F. Supp. 2d 614 (S.D.N.Y. 2012) ..................................................................8, 9

*Laumann v. NHL*,
   2015 U.S. Dist. LEXIS 70155 (S.D.N.Y. May 29, 2015) ...............................3, 5, 6

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
   215 F. Supp. 2d 336 (S.D.N.Y. 2002) .....................................................................5

*Raskin v. Wyatt Co.*,
   125 F.3d 55 (2d Cir. 1997) ......................................................................................7

*Roman v. Sprint Nextel Corp.*,
   2014 U.S. Dist. LEXIS 138951 (S.D.N.Y. Sept. 29, 2014) ..................................6, 9

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004) ..................................................................2, 4

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) (en banc) ............................................................2, 3

## INTRODUCTION

As the Court may recall, CCM touted that its expert(s) would speak to the issue of causation.[1]  CCM now concedes that "Dr. Pomerantz is not offering a causation opinion." (Opposition Brief ("Opp.") at 14.)  That concession eviscerates Dr. Pomerantz's report, which repeatedly pretends to connect the alleged lack of asset growth at Clover Value to Federated's marketing conduct.  (*See generally* Mem. at 2, 3, 9-11, 16, 18.)  Not only are Dr. Pomerantz's opinions not causation opinions, but they also are unsupported, speculative, irrelevant, flawed and unreliable opinions premised on a contrived data set chosen to reach a mathematical result that purports to support CCM's claims, without *any* consideration being given to relevant facts, such as investor behavior and Federated's actual marketing efforts.  (*Id.*)  Indeed, on page one of its Opposition, CCM claims that Clover Value lost $154 million in assets, but ignores that Federated sold over $2 billion of Clover products during the relevant time period, including $364 million of Clover Value and $677 million of Clover Small Cap.  (Mem. at 9.)

CCM's Opposition does not stop with its causation concession.  Instead, in an effort to semantically rearrange the proverbial deck chairs of its sinking case, CCM pretends that this concession is of no consequence and the Court should simply permit Dr. Pomerantz's multi-billion dollar calculations to be paraded before a jury as "a reasonable basis for an estimate of damages."  (Opp. at 14-15.)  However, as detailed below, sticking a "damages" label over Dr. Pomerantz's calculations cannot save them because CCM still needs to demonstrate that these calculations satisfy *Daubert*.  CCM fails to do so.  Mr. Sheetz's opinions also should be excluded because they incorporate Dr. Pomerantz's opinions.

---

[1] Capitalized terms used herein, unless otherwise defined, shall have the meanings ascribed to them in the Memorandum of Law in Support of Federated Investors, Inc.' Motion to Exclude Certain Opinions Proffered by Plaintiff, dated August 4, 2015 ("Mem.").

**ARGUMENT**

**I.    CCM MISSTATES THE APPLICABLE LEGAL STANDARD**

CCM concedes that it must establish the admissibility of Dr. Pomerantz's opinion (Opp. at 8-12) but attempts to avoid *Daubert* by arguing that Dr. Pomerantz allegedly is opining on the "soft science" of "economics."  (*Id.* at 10-11, 13-14 (citing *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 180914, at *117-18 (E.D.N.Y. Oct. 15, 2014); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*, 313 F. Supp. 2d 213, 228-29 (S.D.N.Y. 2004)).)  The Court should reject CCM's invitation to afford "deference" to Dr. Pomerantz's analysis.

*First*, Dr. Pomerantz's analysis is not "soft science."  The "soft" economic analyses in CCM's cases involve creating a complex statistical model or using quantitative data to opine on market or investor behavior.  *See Air Cargo*, 2014 U.S. Dist. LEXIS 180914, at *117-18 (economist creating complex statistical model); *U.S. Info.*, 313 F. Supp. 2d at 228-29 (economist's inferences (based on economic theory) applied to data from a statistical analysis of quantitative data).[2]  Dr. Pomerantz did not engage in any such analysis.  In fact, Dr. Pomerantz eschewed any attempt to study the adequacy of Federated's marketing efforts or investor behavior and remained indifferent to the reasons why and how any of his peer group funds raised money from investors.  His report is straightforward application of mathematics: calculating the average assets of one group of funds and applying that average to a different group.  (Opp. at 12.)  As any student who has tackled a mathematics "proof" in class would attest, mathematics (unlike economics) is a "hard" science: *i.e.* $2+2 = 4$, always.  *See e.g., United States v. Frazier*, 387 F.3d 1244, 1261 n.14 (11th Cir. 2004) (en banc) ("Scientific evidence encompasses so-

_____

[2] CCM recognizes that Dr. Pomerantz undertook only "analysis" and "calculat[ions]," (Opp. at 4-8), whereas Mr. Sheets purportedly "constructed a model." (*Id.*)  *Air Cargo* discussed at length the "judgment and art" an expert uses when "[c]reating statistical models," 2014 U.S. Dist. LEXIS 180914, at *118, but CCM omits that qualification when quoting that passage. (Opp. at 10-11.)  This is because Dr. Pomerantz did not construct a statistical model.  He just calculated averages without regard to core statistical requirements.

called **hard sciences** (such as physics, chemistry, **mathematics**, and biology) as well as **soft sciences** (such as **economics**, psychology, and sociology) . . . .")[3] (emphasis added) (quoting Schwarzer & Cecil, "Management of Expert Evidence," *Reference Manual on Scientific Evidence* 39 (Federal Judicial Center, 2d ed. 2000))).  Nor did Dr. Pomerantz construct some elaborate statistical model.   He averaged two sets of net cash flows (*i.e.*, sales minus redemptions) and declared the result to be an "industry norm."  Thus, while Dr. Pomerantz may claim to be an economist, what he did in ***this*** case was just math, not any analysis of investor behavior, preferences or decision making.

*Second*, even if one were to assume that Dr. Pomerantz's analysis was a "soft" one, *Daubert* would apply with equal rigor.  Although the reliability *criteria* for soft and hard sciences can differ, the tests are equally rigorous: "This is not to suggest, however, that a non-scientific expert's testimony is subject to less rigorous standards of reliability . . . ." *EEOC v. Bloomberg L.P.*, 2010 U.S. Dist. LEXIS 92511, at *44-45 (S.D.N.Y. Aug. 31, 2010) (excluding social psychologist's soft science opinion).  Experts need to satisfy *Daubert* "no matter how burdensome or difficult collecting relevant data or devising methods to apply to that data may be." *Laumann v. NHL*, 2015 U.S. Dist. LEXIS 70155, at *37 (S.D.N.Y. May 29, 2015).

*Third*, this Court routinely excludes analyses when the proponent does not meet the standard.  For example, under *Daubert*, this Court recently excluded a detailed, complex statistical expert opinion by a "nationally-recognized sports economist" that related solely to damages, because the movant's critiques, taken together, demonstrated that the expert's opinion on hypothetical lost sales was unreliable.  *Id.* at *8, *37-39 (expert relied on assumptions rather

---

[3] CCM tries to distinguish five of Federated's cases because they apply to "hard sciences."  (Opp. at 11 n.26.)  Federated has cited several other cases, however, that involved "soft sciences," including cases that excluded statistical analyses with the same flaws as Dr. Pomerantz's opinions.  (Mem. at 14-25.)  Indeed, some of the very cases that CCM tries to distinguish included soft science.  (Opp. at 11 n.26; *Frazier*, 387 F.3d at 1261 n.15.)

than "sufficient data about consumer tastes and preferences"). Indeed, both cases CCM cites *excluded* statistical opinions that failed to satisfy *Daubert*. *In re Air Cargo*, 2014 U.S. Dist. LEXIS 180914, at *128-31 (excluding expert testimony "premised on a miscalculation" and supported by an unreliable statistical test); *U.S. Info.*, 313 F. Supp. 2d at 233-35 (excluding statistics opinion because proponent did not show the data set was unbiased).

## II.  THE OPINIONS OF DR. POMERANTZ SHOULD BE EXCLUDED

### A.  Dr. Pomerantz's Opinions Are Inadmissible For Damages

Conceding that Dr. Pomerantz's testimony is inadmissible as to causation, CCM argues that his opinion is admissible as to damages. This contention is simply a feint. CCM's own words demonstrate that it is doing nothing more than re-packaging flawed opinions. For example, CCM claims "Dr. Pomerantz's opinion is that, had Federated 'raised funds at a rate commensurate' with its peers, Clover Value would have 'received an additional $3.9 billion in assets.'" (Opp. at 14.) However, as noted in Federated's opening brief, Dr. Pomerantz cannot help CCM, or ultimately a jury, make this connection because he does not actually study *how* Federated or any other fund in his peer group raised funds from investors. (Mem. at 16.)

Nor is there any methodology or explanation in his report or work product that would permit a trier of fact simply to assume that every dollar not invested in Strategic Value *would necessarily* have been invested in Clover Value. (Mem. at 11.) Yet, his analysis is premised on just that "zero-sum" game assumption. Indeed, as CCM's brief admits, Dr. Pomerantz's own sorting methodology for selecting mutual funds refutes that assumption: when his two-step methodology is applied to the data he uses, Strategic Value and Clover Value end up in separate categories. (Opp. at 5.) Thus, an investor sorting the Morningstar database for a "large cap" value fund with a prospectus objective of "growth" would find Clover Value *but not* Strategic Value. (*Id.*) Similarly, an investor seeking a prospectus objective of "equity income" would find

4

Strategic Value **but not** Clover Value.  (*Id.*)  Further, Federated offered another large cap value fund (MDT Stock Trust), and Dr. Pomerantz does not account for an investor choosing MDT Stock Trust over Clover Value.  Thus, no matter how it is labeled by CCM, Dr. Pomerantz's calculation should be excluded under *Daubert*.

Dr. Pomerantz's analysis also is premised on the unsupported speculation that additional marketing efforts by Federated could or should have raised additional funds at the rate Dr. Pomerantz calculated for his peer funds.  By ignoring actual marketing efforts at Federated and the peer funds, Dr. Pomerantz has foregone the relevant inquiry.  Damages, however, must be tethered to the alleged harm.  *See, e.g.*, *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 341-44 (S.D.N.Y. 2002) (describing the standard in detail); *see also Laumann*, 2015 U.S. Dist. LEXIS 70155, at *41 ("For demand to be reliably estimated, [the expert] needs a data-driven basis for his underlying assumptions . . . .").  Here, CCM seeks damages designed to put it in the position it would have been in a "perfect" world, namely the additional Contingent Payments it would have received because increased marketing efforts would have purportedly brought in additional assets, while ignoring at the same time the uncontroverted testimony and evidence of Federated's significant marketing efforts.  (*See* Tambe Supp Decl. ¶ 2; Fed. Ex. 159 (CCM's Responses to First Set of Interrogatories) at No. 19; Mem. at 5-7 (summarizing selected marketing efforts).)  To be relevant to damages, therefore, Dr. Pomerantz would need to *directly connect* his opinion that $3.9 billion that were actually invested in Strategic Value would instead have been invested in Clover Value *to* some marketing failure by Federated.  *See Point Prods.*, 215 F. Supp. 2d at 341-44.  He cannot do that, however, because he admitted that he did not analyze any marketing efforts by Federated, or those by any of his peer funds.[4]  (Mem. at 16.)

_____

[4] Such an opinion is also contrary to the extensive evidence of Federated's undisputed marketing efforts that Federated presented in its opening brief, none of which CCM disputes.  (Mem. at 5-7 (providing examples of

Minus that connection, this opinion should be excluded.

Further, all of Federated's critiques of Dr. Pomerantz's conclusion that the Clover Value products should have received $3.9 billion more in assets, taken together, demonstrate that his methodology is unreliable and his conclusion is both unsupported and irrelevant.  (Mem. at 18-23 (citing cases)); *see also Laumann*, 2015 U.S. Dist. LEXIS 70155, at *25, *37-39 (critiques taken together show the "fundamental and fatal" problem of relying on assumptions, instead of "sufficient data about consumer tastes and preferences").  CCM dismisses each problem individually—some are not "meaningful," others demonstrate the "mathematically expected result"—and argues that the criticisms merely go to the weight of the evidence.  (Opp. at 15-22.)

That misses the point.  The problem with Dr. Pomerantz's math is not that he used Morningstar data, or how he added or multiplied.  Rather, when the Court considers the proposition for which his analysis is being offered, it falls apart with any small tweak or close look at any individual piece.  *See Roman v. Sprint Nextel Corp.*, 2014 U.S. Dist. LEXIS 138951, at *16-18 (S.D.N.Y. Sept. 29, 2014) ("[H]is own *ipse dixit* is insufficient to tie his replication and extrapolation to the facts of this case . . . .").  In short, Dr. Pomerantz "cherry-picked" a data set that would mathematically provide a result that CCM could claim supports its damage claim and offered nothing tying the results to Federated's conduct.  Some examples follow:

**The "New Money" Flowing to Clover Value Is at the Median of the 13 Peer Funds** – CCM does not dispute that of the 13 peer "Clover-like" funds identified by Dr. Pomerantz, six had less "new money" flow to them than Clover did during the four years used by Dr. Pomerantz, and seven had more.  (Opp. at 15-16.)  CCM instead claims that averages (means), not medians, should govern.  (*Id.*)  Even if true, that contention misses the point because Dr.

Federated's marketing efforts); *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 511 F. App'x 54, 56-57 (2d Cir. 2013) (affirming exclusion of expert opinion "detached from the actual evidence").)

Pomerantz offers no explanation—other than his *ipse dixit*—why the Clover should have attracted $1.98 billion in *additional* assets when Clover Value's experience was in the middle of the experiences of his 13 peer funds.  *See, e.g.*, *Faiveley Transp.*, 511 F. App'x at 56-57 (excluding expert whose "sweeping statements were detached from the actual evidence").

     **Fund Specific Anomalies –** CCM concedes that if the Fidelity funds are taken out of Dr. Pomerantz's asset allocation, his result reverses entirely, from 44%/56% to *-1065/1165%*.  (Opp. at 17; Mem. at 19, Tab H.)  CCM then argues that the removal of the Black Rock funds "would have *doubled* the average net assets raised for Clover-like funds."  (Opp. at 17.)  That only underscores the problem, however.  The conclusion from a reliable and rigorous sample would not flip back and forth so dramatically based on one or two data changes.  *See, e.g.*, *Celebrity Cruises, Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 186 (S.D.N.Y. 2006) ("A methodology so sensitive to one highly subjective variable lacks the necessary reliability.").  The problem is compounded here because Dr. Pomerantz chose not to study the reasons for the fund flows.  The Fidelity fund, unlike the Clover funds, is closed to public investors, meaning that flows of new money into, and redemptions out of, the Fidelity Fund are controlled by Fidelity's internal advisors, not by investment decisions made by individual investors.  (Mem. at 19.)  Other funds in his group have billions of dollars in increased assets as a result of fund mergers and not investment decisions by investors. (Mem. at 20, 22 n.14.)  In short, Dr. Pomerantz is allowing something wholly unrelated to marketing – fund mergers – to impermissibly affect his results.  *See, e.g.*, *Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997) (affirming exclusion because expert did not account for fundamental differences in the comparison group).

     **Year-to-Year Variability –** CCM does not dispute that Dr. Pomerantz's calculation of the "modified Clover flow" of "new money" shows that Clover Value would have lost $214 million in "new money" in 2013, when in fact, it only lost $107 million in "new money" by Dr.

Pomerantz's own calculation.  (Opp. at 22; Mem. at 18-19, Tab C.)  In other words, Dr.

Pomerantz's own calculation contends that Clover Value should have had $107 million *less* in

"new money" in 2013.  A rigorous and reliable methodology would not produce such an

incongruous result.  *See, e.g.*, *Celebrity Cruises*, 434 F. Supp. 2d at 190-91 (excluding expert

opinion premised on a ship's profits remaining constant when the expert's data show that ship's

revenue actually declined).  Similarly, CCM quibbles with breaking down Dr. Pomerantz's

allocations on a year-by-year basis (Opp. at 22), but cannot dispute that his analysis produces

very different allocations each year.  (*See* Mem. at Tab D.)

Finally, CCM invokes *In re State Street Bank* to support its damages calculation.  (Opp.

at 2, 3, 12-15, 18.)  In that case, the plaintiff retirement plan alleged that an investment manager

breached its ERISA duties by investing too heavily in subprime assets.  *In re State St. Bank &*

*Trust Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 614, 647-49 (S.D.N.Y. 2012).  The

plan asserted that its damages were the difference between the amount of assets resulting from an

appropriate level of investment in subprime securities, as opposed to the actual higher level of

investment.  *Id.* at 658-59.  To demonstrate that difference, the plan's expert analyzed two proxy

funds that (1) used the same benchmark as the fund at issue, (2) had approaches "consistent

with" the fund at issue, and (3) "[i]mportantly," had exposure to subprime assets of 7% and 14%,

as opposed to the 150% invested by the fund at issue.  *Id.*  Because these proxy funds had the

attribute at issue (lower investment in subprime funds than the fund at issue) and because the

opposing party entered no contrary evidence, the court accepted the expert's calculation of

damages based on the higher level of assets achieved by the proxy funds.  *Id.* at 659.  *State Street*

is of no help to CCM.  It concerned the suitability of a manager's investment decisions, and the

court did no *Daubert* analysis.  If anything, *State Street* points out exactly what Dr. Pomerantz

did not do: the expert in *State Street* measured the key variable at issue (percentage of funds

invested in subprime assets), whereas Dr. Pomerantz did not bother to examine the marketing efforts of Federated or any of his peer funds.[5]

**B.      CCM Offers No Justification for Dr. Pomerantz's SMA Conclusion**

Dr. Pomerantz attributes *half* of the $3.9 billion in additional assets that he asserts should have gone to the Clover products to separately managed accounts ("SMAs").  (Mem. at 11.) Federated showed that Dr. Pomerantz offered no basis to extrapolate his mutual fund allocation to SMAs to capture that $1.9 billion.  (*Id*.)  Dr. Pomerantz ignores this point in his affidavit and CCM devotes just a single footnote to defending this logical leap, simply declaring without any analysis that SMAs are "clones" of their corresponding mutual funds.  (Opp. at 6 n.14.)  This is insufficient under *Daubert*.  *Roman*, U.S. Dist. LEXIS 138951, at *16-18 ("[H]is own *ipse dixit* is insufficient to tie his . . . extrapolation to the facts of this case . . . .").

**C.      Dr. Pomerantz's Small Cap "Capacity" Opinion Should Not Be Admitted**

CCM has conceded that Dr. Pomerantz has no opinion on causation.  (Opp. at 14.) Therefore, his Small Cap opinion should also be excluded.  Again, CCM tries to recast Dr. Pomerantz's Small Cap opinion as something else.  Dr. Pomerantz opines that Clover Small Cap was below its capacity, but CCM concedes Dr. Pomerantz merely lists the assets under management at the other small cap funds, with no analysis of any marketing or sales efforts for those funds or their growth and no comparison of their growth to Clover Small Cap's.  (Mem. at 24; Opp. at 7-8.)  A list of other funds' assets under management by itself means nothing, and the facts are that Clover Small Cap had more net inflows from 2009-2013 than six of Dr.

---

[5] *State Street* also applied a damages standard that is unique to its ERISA context, whereby the court "presumes" the "most profitable" "alternative investment strateg[y]."  842 F. Supp. 2d at 656.  There is no such presumption available to CCM in this case.

Pomerantz's 10 funds.  (Jacobson Decl. ¶ 5.)[6]  Moreover, Dr. Pomerantz's Small Cap Opinion has no bearing on damages.  He conceded that his $3.9 billion calculation concerns only Clover Value, not Clover Small Cap.  (Tambe Decl. ¶ 43, Pomerantz Tr. 42:18-43:5.)  His small cap opinion is thus irrelevant, not useful to any jury, and should be excluded.  (Mem. at 23-25.)[7]

## III.    THE OPINIONS OF MR. SHEETS SHOULD BE EXCLUDED

CCM admits that Mr. Sheets's damages estimate is predicated on Dr. Pomerantz's calculations:  "Dr. Pomerantz's asset allocation opinion is the predicate for a reasonable estimate of *damages* calculation by Mr. Sheets."  (Opp. at 3; *id.* at 4 ("As a predicate for an estimate of damages to be calculated by Mr. Sheets . . . .").)  CCM also admits that Mr. Sheets used Dr. Pomerantz's $3.9 billion figure to calculate damages of over $37 million.  (*Id.* at 8.)

These opinions by Mr. Sheets rise and fall with the underlying opinions by Dr. Pomerantz.  CCM does not argue that there is an independent basis to admit these opinions. (Opp. at 24-25 (asserting that Federated's challenge to Mr. Sheets "is entirely collateral" and should be denied solely "[b]ecause Dr. Pomerantz's [testimony] is admissible").)  Mr. Sheets's opinions should be excluded to the extent they rely on Dr. Pomerantz's excluded opinions.[8]

### CONCLUSION

Federated respectfully requests that the Court enter an order substantially in the form attached to Federated's Motion as Exhibit A, granting the relief requested therein.

---

[6] Clover Small Cap had net flows of $348 million between 2009 and 2013.  (Jacobson Decl. ¶ 5.) Taken in aggregate, all of the funds in the Morningstar Small Value category, which includes Clover Small Cap, had net flows of just $71 million during the same period. (*Id.* ¶¶ 8-9.)

[7] CCM asserts that Federated had no other "in house" small cap product (Opp. at 7-8), but in fact Federated had another small cap value fund for much of the period in question and a small cap fund other than Clover Small Cap for the entire time.  (Jacobson Decl. ¶ 10.)  Consequently, CCM's conclusion that Federated was willing to promote Clover Small Cap only because it had no "competing" product (Opp. at 7-8) is simply belied by the facts.

[8] CCM argues in a footnote that it "could provide Mr. Sheets with an alternative (*i.e.,* non-expert) evidentiary basis for a net cash flow input for his model."  (Opp. at 25 n.58.)  CCM offers no details to this "alternative" basis.  Any such alternative basis could have and should have been part of Mr. Sheets's prior report. Allowing such a new opinion after the close of expert discovery would be contrary to the expert disclosure rules, prejudice Federated, and unduly increase the cost of this litigation.

Dated: September 18, 2015

New York, New York

Respectfully submitted,

/s/ Jayant W. Tambe
JONES DAY
Jayant W. Tambe
Tracy V. Schaffer
222 East 41st Street
New York, New York  10017
Telephone:     (212) 326-3685
Facsimile:     (212) 755-7306
jtambe@jonesday.com
tschaffer@jonesday.com

Jeffrey D. Baltruzak
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania  15219-2514
Telephone:  (412) 391-3939
Facsimile:   (412) 394-7959
jbaltruzak@jonesday.com

*Attorneys for Federated Investors, Inc.*