```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
CCM ROCHESTER, INC.,                       :
                                           :
                        Plaintiff,         :
                                           :            14-CV-3600 (VEC)
            -against-                      :
                                           :                 ORDER
FEDERATED INVESTORS, INC.                  :
                                           :
                        Defendant.         :
------------------------------------------------------------- X
```

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/31/2016
```

VALERIE CAPRONI, United States District Judge:

CCM Rochester, Inc., a registered investment advisor formerly known as Clover Capital Management, Inc. ("CCM" or "Clover"), filed suit on May 20, 2014, seeking damages arising out of a 2008 Asset Purchase Agreement (the "APA") pursuant to which Federated Investors, Inc. ("Federated") acquired substantially all of the assets of CCM. Compl. ¶¶ 2, 4. Federated moved to exclude certain opinions offered by Plaintiff's experts Steven Pomerantz ("Pomerantz") and Glenn Sheets ("Sheets"). *See* Dkts. 46-49. This Court granted Federated's motion during oral argument on June 9, 2016, and indicated a written decision would follow. *See* June 9, 2016 Order (Dkt. 64). For the reasons discussed at oral argument and pursuant to this order, Federated's Motion is GRANTED.

## BACKGROUND[1]

In early 2008, "Clover sought a strategic partner with strong marketing capabilities" to invest in its products to "realize the full potential of [Clover's] investment management franchise." Compl. ¶ 2. After a period of courtship, the parties agreed that Federated would

---

[1] The Court cites to Defendant's Memorandum of Law in Support of its Motion to Exclude Certain Opinions Proffered by Plaintiff (Dkt. 47) as "Def. Mem.," Plaintiff's Memorandum of Law in Opposition to Defendant's *Daubert* Motion (Dkt. 51) as "Pl. Opp.," and Defendant's Reply Memorandum of Law in Support of its Motion to Exclude Certain Opinions Proffered by Plaintiff (Dkt. 54) as "Def. Reply."

1

acquire all of CCM's assets and the parties entered into the APA.  Under the APA, Federated's purchase of CCM's assets was structured so that there was an upfront cash payment to CCM at closing of $30 million and contingent payments (the "Earnout Payments") over five years (the "Earnout Period").  *Id.* ¶¶ 40-41.  The contingent payments, which were tied to the growth in revenues of the acquired business, ultimately amounted to approximately $18 million.  *Id.* ¶ 115.

Plaintiff asserts claims for fraudulent inducement and breach of an implied duty of good faith and fair dealing.[2]  CCM asserts that Federated fraudulently induced CCM to accept its acquisition offer and to accept much of the consideration in the form of future payments that were contingent upon CCM's post-acquisition growth.  *Id.* ¶ 5.  CCM contends Federated misrepresented its intent to use its marketing and distribution platform to grow the assets under CCM's management.  *Id.* ¶¶ 26-39, 118-121.  According to Clover, Federated actually intended "to undertake only minimal, *pro forma* efforts to market and distribute the Clover [funds] and, even then, to do so as late in the Earnout Period as possible in order to minimize its Earnout Payments to Clover."  *Id.* ¶ 37.  Moreover, CCM alleges that in the third year of the Earnout Period, "Federated launched an intensive marketing and distribution campaign on behalf of its own Strategic Value Dividend Fund, a value-oriented fund, which . . . was competing in the same space for assets with Clover's Large Cap Value Fund."  *Id.* ¶¶ 76-78 (internal quotation marks omitted).[3]  CCM contends that, consistent with Federated's bottom-line incentives, this marketing campaign "affirmatively steered clients seeking large cap value products away from Clover's Large Cap Fund" and increased the assets under the competing fund's management by

---

[2]      On November 25, 2014, this Court dismissed CCM's claim for breach of contract to use best efforts.  *See* Nov. 25, 2014 Op. & Order (Dkt. 21).

[3]      Consistent with the parties' references, the Court refers to Federated's Strategic Value Dividend Fund as "Strategic Value" and Clover's Large Cap Value Fund as "Clover Value."

more than $15 billion dollars during the last three years of the Earnout Period. *Id.* ¶¶ 79, 86. CCM also asserts that Federated's acts and omissions constituted affirmative efforts to minimize CCM's Earnout Payments in breach of their implied duty of good faith and fair dealing. *Id.* ¶¶ 88-89, 131-135.

In support of these claims, Plaintiff has offered expert opinions from Pomerantz and Sheets. Pomerantz constructed a peer group of mutual fund advisors that offer both "Clover-like" and "Strategic-like" products[4] and then examined how net cash flow into the peer group advisors was allocated between the two types of funds. *See* Pl. Opp. at 4-6. Calculating "the proportional net cash flow between the Clover-like and Strategic-like funds within each peer group advisor and . . . the average across the entire peer group," Pl. Opp. at 6, Pomerantz concluded that, within the peer group, if one looked at the total of net cash flow that went into the advisor's Clover-like fund and its Strategic-like fund, 44% of new cash flow went to the Clover-like funds and 56% to the Strategic-like funds. *See* Welch Decl. Ex. 1 at 11 (Dkt. 53-1) (hereinafter, "Pomerantz Report"). Pomerantz then used this average "allocation ratio" to recalculate the cash flows that actually went to the Clover Value and Strategic Value mutual funds; he concluded that "had Federated . . . raised funds at a rate commensurate with other funds in the market with a similar management profile and performance record," Clover products would have "received an additional $3.9 billion in assets." Pomerantz Report at 3, 5, 11-12; *see*

---

[4] Pomerantz's peer group contained "every fund advisor that offered both a Large Value fund with a prospectus objective[] of Growth (like Clover Value)[] and a competing Large Value fund with a prospectus objective of Equity-Income (like Strategic Value)." Pomerantz Report at 9. Pomerantz explained that a "Large-Cap Value fund" is "a mutual fund that invests in stocks of companies with a market capitalization value of more than $10 billion." Pomerantz Report, at 5 n.3. In addition to capitalization, stocks are also secondarily classified by their style: Growth, Value, or Blend. *Id.* "Value" refers to "stocks with lower price/earnings ratios" while "Growth" refers to "stocks with higher price/earnings ratios, though other metrics such as price/book or dividends are often used." *Id.*

*also* Pl. Opp. at 6.  The Court refers to these portions of Pomerantz's Report as his "asset allocation opinion."

Pomerantz also offered a performance opinion analyzing how Clover Value and Strategic Value funds performed in relation to their peer groups.  Pl. Opp. at 6.  He concluded that Clover Value either met or exceeded investment performance averages in relation to its peer groups and was "well positioned from a competitive standpoint," while Strategic Value lagged its peer group competitors.  Pomerantz Report at 13-21.[5]  Plaintiffs argues Pomerantz's performance opinion is relevant to rebut Federated's argument that asset-allocation disparities between Clover Value and Strategic Value were attributable to Clover Value's poor performance.  Pl. Opp. at 7.

Moreover, Pomerantz opined that, despite the assets raised for Clover Small Cap Value fund, the fund was still "far below its capacity."  Pomerantz Report at 22.  He based his opinion on a comparison of the fund's $642 million in assets under management to the assets under management of ten Small Cap Value Funds that each exceeded $2 billion.  *Id.* at 22.[6]  Pomerantz's opinion that Clover Small Cap Value was far below its capacity is relevant, according to Plaintiff, to rebut Federated's argument that the reason Federated did not market Clover Value was because its strategy was to first sell out Clover Small Cap Value.  Pl. Opp. at 7.  According to Plaintiff, Pomerantz's capacity opinion tends to prove Federated's putative marketing strategy was pretextual.  *Id.*

Plaintiff's other expert, Sheets, relied on Pomerantz's asset allocation opinion to present his own opinion on CCM's damages.  Sheets constructed a model to calculate the additional

---

[5]   The Court refers to this portion of Pomerantz's report as his "performance opinion."  *See* Pomerantz Report at 13-21.

[6]   The Court refers to this portion of Pomerantz's report as his "capacity opinion."  *See* Pomerantz Report at 21-22.

4

Earnout Payments that Clover should have earned pursuant to the formula set forth in the APA. *See* Pl. Opp. at 8.  As an input to that model, Sheets used Pomerantz's finding that Clover Value should have received an additional $3.9 billion in net assets.  *See* Sheets Report ¶¶ 53-63.

## DISCUSSION

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The district court acts as a gatekeeper under Rule 702 and is charged with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 503 (S.D.N.Y. 2015) ("A trial court should therefore admit expert testimony only where it is offered by a qualified expert and is relevant and reliable."); *Forte v. Liquidnet Holdings, Inc.*, No. 14 CIV. 2185 (AT), 2015 WL 5820976, at *5 (S.D.N.Y. Sept. 30, 2015) ("In order for an expert opinion to be admissible, the witness 'must be qualified as an expert, the testimony must be reliable, and the testimony must assist the trier of fact.'" (quoting *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009))).  A district court has broad discretion to carry out its gatekeeping function.  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016).  The proponent of the expert

testimony bears the burden of establishing by a preponderance of the evidence that the proffered testimony meets the admissibility requirements of Rule 702.  *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 253 (S.D.N.Y. 2010); *Dreyer v. Ryder Auto. Carrier Grp.*, 367 F. Supp. 2d 413, 424-25 (W.D.N.Y. 2005).

Defendant argues that Pomerantz's expert opinion is not admissible on multiple grounds.  *See generally* Def. Mem.  As to Sheets, Defendant urges that, because Sheets relied on Pomerantz's flawed allocation analysis as an input for his model, that portion of Sheets' opinion should be excluded.  *Id.* at 25.

To determine reliability, the Court looks to the indicia of reliability identified by Rule 702, "namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'"  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).  The Supreme Court in *Daubert* identified a number of factors that may bear on reliability, including:

> (1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Id.* at 266 (quoting *Daubert*, 509 U.S. at 593-94) (internal citations omitted).  The reliability inquiry is "fluid" and necessarily varies from case to case.  *Id.*; *see also Daubert*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is . . . a flexible one."); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("[T]he gatekeeping inquiry must be tied to the facts of a particular case." (internal quotation marks and citation omitted)).

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. "[A] trial judge should exclude expert testimony if it is speculative or conjectural or . . . in essence 'an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). In its gatekeeping role under Rule 702, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152.[7]

"[E]xpert testimony is [also] subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (quoting Fed. R. Evid. 403). Expert testimony is particularly risky "given the unique weight such evidence may have in a jury's deliberations." *Id.*; *see also Daubert*, 509 U.S. at 595 ("'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" (quoting

---

[7] Plaintiff argues that deference is particularly appropriate to Pomerantz's opinion because his expert testimony concerns "soft sciences" like economics or social sciences and there is "no single, established methodology." Pl. Opp. at 10-11, 13 (quoting *U.S. Info. Sys., Inc. v. Int'l Bd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 228-29 (S.D.N.Y. 2004)). The Court need not decide whether Pomerantz's opinion is a hard or soft science. As Plaintiff concedes, an expert's opinion on soft sciences still "'depends upon judgment and art as well as the reasoned manipulation of numbers.'" Pl. Opp. at 11 (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, No. 06-MD-1775 (JG) (VVP), 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

7

Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991))).

Pomerantz's expert opinion regarding asset allocation is not admissible because it does not employ the rigor one would expect from an expert in his field nor a reasoned manipulation of numbers—it is based on premises and data that are simply inadequate to support the conclusions he reaches. The Court need not parse through each and every argument that the parties advance. Suffice it to say that Pomerantz's opinion suffers from two omissions affecting its reliability: (1) the absence of any regression analysis and (2) the omission of a standard deviation. Without those analyses, there is a disconnect between Pomerantz's data and methodology and his conclusion; accordingly, his opinion must be excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another . . . . [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Pomerantz's asset allocation opinion lacks any regression or other analysis to demonstrate that there is any correlation between marketing efforts of a fund advisor and the allocation of new dollars between various funds within the family.[8] The parties disagree over whether Pomerantz is offering a causation or marketing opinion. Plaintiff and Pomerantz are adamant that he is offering neither, and that CCM intends to prove proximate causation between

---

[8] As a matter of logic, it is not apparent that marketing (as compared to factors like the longevity of the fund manager, the fund's Morningstar rating, or its expense ratio) is what drives investors to decide to invest in fund A or fund B within a particular investment company. Although any number of factors could have an impact, Pomerantz's opinion ignores all factors that might account for variation in investment in funds within the same family of funds, attributing all differences to the efforts of the investment company.

marketing efforts and asset allocation as a "factual matter" at trial or through summary judgment. Oral Arg. Tr. at 4 (Dkt. 65); Pl. Opp., at 14-15, n.35 (indicating Plaintiff's expert's opinions will provide the jury a reasonable basis for the estimate of damages but "[w]hether Federated's acts and omissions were a proximate cause of those damages is a separate question of fact for the jury."); Welch Decl. Ex. 12, 32:6-34:3 (Dkt. 53-12) (hereinafter, "Pomerantz Dep.") (testifying he has no opinion on the sufficiency, quality, or quantity of Federated's marketing efforts.). But, to the contrary, Federated's efforts, or lack thereof, are a critical underlying premise to Pomerantz's conclusion that "had Federated . . . *raised funds* at a rate commensurate with other funds in the market with a similar management profile and performance record," Clover products would have received (on average) an additional $3.9 billion in assets. Pomerantz Report at 3, 5 (emphasis added); *see also id.* at 6 ("Central to my opinion is the identification of new assets that *would have gone* to Clover Value *had Federated's fund raising efforts* followed industry patterns" (emphasis added)); 11 ("*Had Federated raised new money* for the Competing Funds consistent with the industry average calculated above, then Clover would have received an additional $1.98 billion in assets . . . , rather than losing $154 million." (emphasis added)).

For Plaintiff to argue otherwise is disingenuous. Underlying Pomerantz's conclusion is the premise that the investment advisers' efforts or lack thereof, and not any other variable, determined the relative allocation of new funds that he observed between Clover-like funds and Strategic-like funds within a single family of funds. Without a regression or other similar analysis,[9] however, to demonstrate that there is any correlation, let alone a strong correlation,

---

[9] A "[m]ultiple regression analysis is a statistical tool for understanding the relationship between two or more variables. Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable. . . . Multiple regression analysis is sometimes well suited to the analysis of data about competing theories in which there are several possible explanations for the relationship among a number of explanatory variables." Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, Annotated Reference Manuel on Sci. Evid. 181 (2d ed. 2005) (internal references omitted).

between investment adviser marketing efforts and relative asset allocation, Pomerantz's opinion that Clover would have received $3.9 billion in additional assets had Federated upped its efforts suffers from a logical flaw that renders it inadmissibly speculative and conjectural. *Amorgianos*, 303 F.3d at 266 (The Court must exclude an expert opinion when it "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached."); *Zerega*, 571 F.3d at 213-14 ("[A] trial judge should exclude expert testimony if it is speculative or conjectural.").

More fundamentally, Pomerantz's asset allocation opinion also fails to provide the standard deviation associated with his average asset allocation ratio or even to present the range of data for the ratios he calculated. Instead, he presents his findings in the aggregate:

> In terms of the percentage of the whole, new money is thus allocated based on the relative weights of growth for these two groups, with Clover[-like funds] receiving . . . 44% of the total, while Strategic[-like funds] receive[] 56%.
>
> Therefore, . . . the rate at which investor flows entered the Clover Value-like and Strategic Value-like funds was very close. Furthermore, given that Clover Value and Strategic Value had roughly comparable asset levels at the end of 2009 and comparable returns, their growth in the form of New Money should have been much closer based on industry averages.

Pomerantz Report at 11.

Plaintiff made clear that Pomerantz calculated these numbers using an arithmetic mean. Pl. Opp. at 15, n.40. Although the parties argue over the appropriateness of using the mean instead of the median, Pl. Opp. at 15-16; Def. Reply at 6-7, Pomerantz's opinion is fundamentally flawed because he bases his opinion—that the allocation of new cash flow as between Clover and Strategic "is significantly different than what an analysis of the industry indicates is the expected ratio," Pomerantz Report at 9—on average allocations in comparable

fund families without reference to the range of results or the standard deviation.[10] Indeed, Pomerantz conceded during his deposition that he did not calculate the standard deviation, even though he agreed there was wide variation of results across advisors. Pomerantz Dep. 79-82.[11]

Without taking into account the standard deviation, it is impossible for a fact finder to evaluate the credibility of Pomerantz's conclusion that the allocation of new funds into the two funds is "significantly different" than the industry norms. Without the standard deviation, the Court cannot tell whether the allocation of net funds into the two funds at issue was anything more than chance variation. *Cf. Castaneda v. Partida*, 430 U.S. 482, 496 n. 17 (1977) (in the employment discrimination context, only if "the difference between the expected value and the observed number is greater than two or three standard deviations" from the mean has the plaintiff shown a disparate impact). The Court also has no way of knowing from the observed discrepancy whether the allocation of new money into Federated's Clover and Strategic funds is within one standard deviations from the mean (a point most statisticians would say is meaningless because it is within the normal variation of the population) or is beyond two or three standard deviations such that reasonable statisticians would conclude the difference is something more than chance variation.

---

[10] "The standard deviation for a particular set of data provides a measure of how much the particular results of that data differ from the expected results. In essence, the standard deviation is a measure of the average variance of the sample, that is, the amount by which each item differs from the mean. The number of standard deviations by which the actual results differ from the expected results can be compared to the normal distribution curve, yielding the likelihood that this difference would have been the result of chance. The likelihood that the actual results will fall more than one standard deviation beyond the expected results is about 32%. For more than two standard deviations, it is about 4.6% and for more than three standard deviations, it is about .03%." *Guardians Ass'n of New York City Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York*, 630 F.2d 79, 87 n.4 (2d Cir. 1980).

[11] *See also* Pomerantz Dep. at 80:23-81:9 ("Q. You have not measured the dispersion in your report or your work papers, correct? A. What do you mean by "dispersion"? Q. Well, how far apart the individual observations are from your conclusion of 56/44. A. They're – they're – they're all over. Some are higher. Some are lower.")

These omissions are sufficiently egregious for the Court to conclude that Pomerantz "lacks 'good grounds' for his . . . conclusions." *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli*, 35 F.3d at 746; *Daubert*, 509 U.S. at 590). The Court's objective as gatekeeper is ultimately to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." By failing to conduct a regression analysis and failing to consider the standard deviation in his asset allocation opinion, Pomerantz did not exercise the level of intellectual rigor that characterizes the practice of other experts in his field and his asset allocation opinion must therefore be excluded as unreliable under Rule 702.

Even if Pomerantz's asset allocation opinion was not properly excluded under Rule 702, it would be excluded under Rule 403. Fed. R. Evid. 403. Any slight probative value to his expert testimony is outweighed by the danger that his testimony, given the fundamental flaws the Court has identified, would be unfairly prejudicial and misleading. Accordingly, his asset allocation opinion must also be excluded under Rule 403.

With respect to Sheets, the parties agree that Sheets's opinion uses Pomerantz's asset allocation opinion as a predicate and input for his model. Pl. Opp. at 2, 4, 8; Def. Reply at 10. Plaintiff argues, however, that Sheets did not rely on Pomerantz to construct his model and, accordingly, requests that they be permitted to provide him an "alternative (*i.e.*, non-expert) evidentiary basis for a net cash flow input for his model." Pl. Opp. at 25 n.58. Defendant argues that an alternative basis could have been part of Sheets's prior report and allowing such a new opinion after the close of expert discovery would be prejudicial. Def. Reply at 10 n.8. The Court agrees with Defendant. Plaintiff could have provided an alternative basis for Sheets's opinion but did not. Plaintiff should bear the risk of having relied solely on Pomerantz's

allocation opinion as an input for Sheets's model, and their opinions rise and fall together. Accordingly, Plaintiff's request is denied and Sheets's opinions are excluded to the extent that they rely on Pomerantz's now excluded asset allocation opinion.

Pomerantz's capacity opinion regarding Clover Small Cap Value funds is also inadmissible under Rule 702. Defendant challenges Pomerantz's capacity opinion arguing that it is irrelevant and lacks any meaningful comparative analysis to assist the finder of fact. Def. Mem. at 3, 12, 23-25. The Court agrees. To be admissible under Rule 702, the expert's specialized knowledge must help the trier of fact to understand the evidence. Fed. R. Evid. 702. "Expert testimony is limited to those occasions 'where the subject matter of the testimony is beyond the ken of the average juror.'" *United States v. Ulbricht*, No. 14-CR-68 (KBF), 2015 WL 413318, at *8 (S.D.N.Y. Feb. 1, 2015) (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)); *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008) ("Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own."). "[A] witness must either have first-hand knowledge of the matter about which he testifies, and so testify as a percipient witness, or he must utilize expertise in order to aid the finder of fact in understanding esoteric or complex evidence." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 124 (S.D.N.Y. 2015); *see also Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (excluding expert testimony as "unhelpful" because it was "not generated based on any specialized knowledge, but rather involved basic calculations").

Plaintiff does not need an expert witness to introduce the essence of Pomerantz's capacity opinion. Pomerantz simply took every small cap value fund in the Morningstar small cap value category, sorted those results by size of assets under management, and produced the list of the

top ten small value funds to illustrate that each had more than $2 billion under management. *See* Pomerantz Report at 21-22; Pomerantz Dep. at 43-50. From that list, he deduced that "the assets raised for Clover Small Cap Value are far below its capacity as measured by the prevailing level of assets under management." Pomerantz Report at 22. He offered no comparative analysis and testified that the point of his capacity opinion was simply to observe "that the top ten on that list exceed 2 billion" and to "illustrate that the capacity of small cap funds can . . . be several billion dollars." Pomerantz Dep. 45:4-6, 46:11-16. His observations, however, are obvious to a fact finder from the list of funds, and he offers no testimony that is "beyond the ken of the average juror." *Ulbricht*, 2015 WL 413318, at *8. Accordingly, Pomerantz's capacity opinion is also inadmissible and excluded under 702.[12]

The Court does not, however, exclude the portion of Pomerantz's report that provides a performance opinion. *See* Pomerantz Report, at 13-21. Defendant does not challenge the relevance or reliability of Pomerantz's performance opinion, and the Court finds no reason to exclude it.

## CONCLUSION

For the foregoing reasons, and as discussed at oral argument, Federated's Motion to Preclude Certain Opinions Proffered by Plaintiff (Dkt. 46) is GRANTED. The parties must

---

[12] The Court also has very real concerns regarding whether Pomerantz's capacity opinion would be able to survive a Rule 403 challenge. Plaintiff's argument—that Federated's putative strategy to market the Clover Small Cap Value fund first was pretextual because the fund still had capacity at the end of the Earnout Period—is a *non sequitur*. There are many possible reasons why Clover Small Cap Value could still have capacity, and Pomerantz offers no explanation or analysis for why available capacity means Federated did not have an actual strategy, that it attempted to execute, to raise money for Clover Small Cap Value before it raised money for Clover Value. To the extent this issue is raised during summary judgment briefing or at trial, Plaintiff will need to explain cogently the logical connection between available capacity and the lack of *bona fides* of Federated's marketing strategy.

continue to brief Defendant's motion for summary judgment, pursuant to this Court's June 9, 2016 Order (Dkt. 64) and July 12, 2016 Endorsement (Dkt. 68).

**SO ORDERED.**

**Date: August 31, 2016**
**New York, New York**

VALERIE CAPRONI
United States District Judge